## COMMONWEALTH vs. VAL MAYFIELD.

Middlesex. February 4, 1986. — November 25, 1986.

Present: WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal*, Grand jury proceeding, Indictment, Instructions to jury, Venue, Verdict, Double jeopardy. *Grand Jury. Evidence*, Grand jury proceeding, Admissions and confessions, Relevancy and materiality, Judicial discretion, Recent invention. *Homicide*.

Discussion of the standards applied by this court in determining whether the false testimony of a witness had the effect of impairing the integrity of a grand jury's proceedings. [620-622]

The integrity of a grand jury proceeding, in which an indictment for murder was returned, was not impaired by certain false testimony of a police detective, to the effect that the medical examiner had given a certain cause of the victim's death and that semen had been found in the victim's vagina, where the statements could properly be considered in the circumstances as neither reckless nor intentional, nor made for the purpose of procuring the indictment. [622-624] LIACOS, J., dissenting.

The integrity of a grand jury proceeding, in which an indictment for murder was returned, was not impaired by a police officer's false testimony to the effect that he had discovered, "right in the area where the [victim's] body was found," a certain cigarette lighter known to have been in the defendant's possession shortly before the crime occurred, although, in fact, the lighter had been found by another police officer and farther from the body than the testimony indicated, where the challenged testimony was not shown to have been given either recklessly or intentionally, and where, in the circumstances, the false statements were not likely to have influenced the grand jury's decision to indict the defendant for murder. [624-626] LIACOS, J., dissenting.

A judge was warranted in concluding that a criminal defendant was not in police custody at the time he made certain statements and, accordingly, the defendant was not entitled to argue that the failure of police to honor his request to have questioning discontinued required the statements to be suppressed from evidence. [626-627]

In the circumstances of the retrial of a defendant for murder, following a trial in which the jury had been deadlocked on the murder indictment but had acquitted the defendant on a charge of rape arising out of the same incident, the judge did not err in admitting evidence of the defend-

ant's alleged sexual assault on the victim, and acted within his discretion in excluding evidence of the defendant's acquittal of rape at the first trial. [627-628]

At the trial of a defendant charged with the murder of an eleven year old girl, the judge acted within his discretion in excluding testimony as to an incident between a prosecution witness and a girl who had refused his invitation for a date, offered to show that the witness, rather than the defendant, might have committed the crime, and the judge was also warranted in not admitting this testimony for impeachment purposes. [628]

The judge at a murder trial did not abuse his discretion in ruling that certain testimony, offered to demonstrate that the police investigation into the victim's murder had been inadequate, lacked probative worth. [628-629]

At a murder trial, evidence of a prosecution witness's prior consistent statements was properly admitted to rebut the inference, raised by the defendant, that the witness's testimony had been influenced by police pressure. [629-630]

A judge's response to a question from the jury on the third day of their deliberations in a criminal case did not trivialize the concept of reasonable doubt. [630]

A defendant convicted of murder made no showing that he had been prejudiced either by pretrial publicity or by a change of venue which preceded his second trial. [630]

Where, at the first trial of a defendant charged with murder, there had been no open and public verdict of not guilty under any aspect of the indictment, the fact that the jury may have been deadlocked, eleven to one, for conviction of murder in the second degree implicated no double jeopardy principle precluding the defendant's subsequent trial and conviction for murder in the first degree. [630]

At a murder trial, it was appropriate for the medical examiner to testify that the victim's injuries were consistent with a particular cause. [630]

INDICTMENT found and returned in the Superior Court Department on October 21, 1983.

The case was tried before *Robert S. Prince*, J.

*John J. Bonistalli* for the defendant.

*Margaret Steen Melville*, Assistant District Attorney (*Jane A. Donohue & Ronald Moynahan*, Assistant District Attorneys, with her) for the Commonwealth.

WILKINS, J. About 2 A.M. on August 2, 1983, the body of eleven year old Mary Ann Hanley was found in a wooded area of Ronan Park in the Dorchester section of Boston. The victim

was dead, her shorts and underwear were down by one ankle, and her face and genitalia bloodied. About two and one-half months later, largely on the basis of recently disclosed testimony of one Kevin Gallagher who claimed to have been an eyewitness to the homicide, the defendant, Val Mayfield, was indicted for murder in the first degree and rape of a child under sixteen years of age. At his first trial in April, 1984, the jury found the defendant not guilty of rape and were unable to reach a verdict on the murder indictment. At a second trial on the murder indictment, in November, 1984, the jury found the defendant guilty of murder in the first degree.

The defendant argues a variety of objections to his conviction and asks for relief under G. L. c. 278, § 33E (1984 ed.). The issue that attracts our particular attention concerns deficiencies in the presentation of evidence to the grand jury which indicted the defendant, deficiencies that the defendant argues undercut the integrity of the grand jury proceedings and require the dismissal of the indictment. We reject both this argument and those contentions urged as grounds for reversal of the conviction, and, after considering the defendant's § 33E argument, we affirm the judgment.

We start with an outline of relevant circumstances known to the police prior to the time the eyewitness Gallagher came forth with his description of the homicide. The defendant, the father of a child by a half-sister of the victim, lived with the victim and her family on Mt. Ida Road in Dorchester, not far from Ronan Park, a large park with several baseball fields, a basketball court, and tennis courts. On August 1, 1983, about 7 P.M., the defendant stole a gym bag belonging to one Ruiz. He took the bag to Ronan Park, removed from it sneakers, which he put on, and gave the bag and its remaining contents to others who were gathered in the area. Ruiz, who had discovered that Mayfield had taken his gym bag, went to the defendant's residence, but the defendant was not there. He returned about 8:15 P.M., and spoke to the victim, who pointed out the defendant. Ruiz then confronted Mayfield, who surrendered the sneakers and told Ruiz what he had done with the bag and its contents.

Shortly thereafter a group of youths including the victim, Mayfield, and Gallagher gathered on the porch of a house across from the park. About 9 P.M., most of the group went to see a motion picture. Gallagher left with the group but did not go to the movies. About this time the victim and the defendant headed toward home in the opposite direction, but shortly the defendant returned to the porch for a brief time. Later that night, when Mary Ann was reported missing, a search of the park was conducted. A neighbor found her body in a tunnel-like area of the park created by overhanding vegetation and carried it to the top of an embankment. She was dead.

In the following days the police obtained certain information that pointed to Mayfield as a suspect. The defendant told Detective Robert F. Ahearn of the Boston police department shortly after the death that he had walked the victim part way home and then had left her when he recalled he had to meet a friend named John at a pizza shop. When pressed, the defendant said John's last name was Vasquez. Investigation did not uncover a John Vasquez. Ahearn noticed three vertical scratches on the defendant's neck which the defendant said one Joey Doyle had given during a wrestling match. There was evidence that Doyle had bitten his nails to the degree that he could not have scratched the defendant. On August 9, 1983, the defendant gave an interview to the police. Toward the end of the interview when confronted with the accusation, "You did it. You did it. Why don't you tell us about it," Mayfield replied that he needed time to think.[1]

Kevin Gallagher first spoke to the police on October 17, 1983, and testified before the grand jury four days later. Gallagher had acknowledged to a family friend that he had been present when the victim was killed, and the friend in turn told the police. Gallagher's story of what happened on the night of August 1, 1983, was substantially the same before the grand jury and at trial.

---

[1] There was evidence at trial that the defendant had sought assistance in establishing an alibi and that, after his arrest, he made other admissions of guilt.

After separating that night from the group of youths who were headed to a motion picture, Gallagher started to walk home, but changed his mind and went to Ronan Park. On entering the park, Gallagher saw the defendant and the victim. He asked them where they were going, and the defendant said, "I have to do something. Well, you'd better come along, too." The three went to the tunnel-like area of the park.

When they arrived there the defendant asked the victim why earlier that night she had identified him to Ruiz. She replied that she had not done so. The defendant began to hit her about the face. She started to cry and called out for help. Gallagher tried to intervene but desisted when the defendant told him to remain where he was standing. He made no further effort to aid the victim.

The defendant knocked the victim to the ground, face down by a tree limb. When on his demand the victim did not get up, he grabbed her by the hair and smashed her face on the tree limb four times. The victim moved no more. The defendant turned her on her back and placed his fingers under her nose to see if she was breathing. He then took her pants down and raped her. He turned to Gallagher and said that he would kill Gallagher and his family if Gallagher told anybody what had happened. He also told Gallagher that he had killed the victim because she was a "rat" and that he had raped her to throw suspicion off himself. Gallagher then went home. Several days later, the defendant threatened him with death if he revealed that the defendant had killed the victim.

1. We consider first the defendant's claim that a detective's false statements to the grand jury impaired the integrity of the grand jury proceedings that led to his indictment. Our discussion starts with consideration of the standards to be applied in assessing such a challenge and concludes with consideration of the specific circumstances on which the defendant relies.

Although generally the adequacy or competency of evidence before a grand jury is not a matter for judicial inquiry (*Commonwealth* v. *Robinson*, 373 Mass. 591, 592 [1977]), we will consider whether grand jury evidence was sufficient to warrant a finding of probable cause (*Commonwealth* v. *McCarthy*, 385

Mass. 160, 163 [1982] ) and whether the defendant has shown that the integrity of the grand jury proceedings was impaired (*Commonwealth* v. *O'Dell*, 392 Mass. 445, 449-450 [1984] ). Because a purported eyewitness to the victim's death testified before the grand jury, we are concerned here only with the claim that the integrity of the grand jury proceeding was impaired.

We must deal with such a question case by case. It is unlikely that we could devise a satisfactory, comprehensive statement of what conduct does, and what conduct does not, impair the integrity of the grand jury process. We have recognized possible impairment if a prosecutor were to deceive grand jurors by presenting remote hearsay in the guise of direct testimony. *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 655 (1979). We have indicated that inaccurate statements made in good faith do not require dismissal of an indictment. *Commonwealth* v. *Reddington*, 395 Mass. 315, 320 (1985). We have never held that an indictment should be dismissed if a witness or prosecutor reasonably should have known (a negligence standard), but did not know, that the witness's testimony was false. In such a case, the prosecutor and the witness would not have intended to use false testimony to procure an indictment, and dismissal of an indictment as a prophylactic measure to discourage intentional wrongdoing could have no application. We have said, however, that if the Commonwealth or one of its agents knowingly uses false testimony to procure an indictment, the indictment should be dismissed, and a prosecutor who learns of the use of the knowingly false, material evidence has a duty to come forward. See *Commonwealth* v. *Salman*, 387 Mass. 160, 166-167 (1982).

In certain instances, the failure to disclose known information may impair the grand jury proceedings. For example, presentation of a defendant's inculpatory statements recorded in a police report, distorted by the intentional failure to disclose the defendant's exculpatory comments interspersed in that report, impaired grand jury proceedings and required dismissal of the indictment in *Commonwealth* v. *O'Dell*, 392 Mass. 445, 448-449 (1984). Similarly, we have indicated that a grand jury

should be told of known exculpatory evidence that would greatly undermine the credibility of an important witness. See *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984).

To sustain a claim that the integrity of the grand jury proceeding has been impaired, not only must the evidence have been given with knowledge that it was false or deceptive, but the false or deceptive evidence must probably have been significant in the view of the grand jury and must have been presented with the intention of obtaining an indictment. Thus, a police officer's knowing and intentional presentation of false but exculpatory testimony would not require dismissal of an indictment. *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 338-339 (1983). The question whether, if a grand jury had been told the true facts, it probably would not have indicted the defendant requires an assessment of all the circumstances. See *Commonwealth* v. *McGahee*, 393 Mass. 743, 746-748 (1985) ("It is unlikely that [disclosure of the withheld information] would have affected the grand jury's decision to indict." *Id.* at 747).

In summary, it is not enough for dismissal of an indictment that false or deceptive evidence was presented to the grand jury. Two further elements normally must be shown. First, our cases have required a showing that false or deceptive evidence was given to the grand jury knowingly and for the purpose of obtaining an indictment. Although we have not heretofore had to decide the point (see *Commonwealth* v. *Reddington*, 395 Mass. 315, 319 [1985]), we would accept that a showing of the Commonwealth's reckless disregard of the truth leading to the presentation of false or deceptive evidence could also warrant dismissal of an indictment.[2] Second, the defendant must show that the presentation of the false or deceptive evidence probably influenced the grand jury's determination to hand up an indictment. This requires a showing not only that

---

[2] See *Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978), concerning false statements, either intentional and knowing or made with reckless disregard for the truth, in an application for a search warrant; *Commonwealth* v. *Nine Hundred & Ninety-two Dollars*, 383 Mass. 764, 771-772 (1981), rejecting, as a ground for suppression of evidence, negligent misrepresentations, even of facts necessary to a finding of probable cause, set forth in an affidavit in support of a search warrant.

the evidence was material to the question of probable cause but that, on the entire grand jury record, the false or deceptive testimony probably made a difference. Thus the fact that intentionally or recklessly false or deceptive evidence concerns a material fact does not alone warrant dismissal of an indictment. The defendant must also show probable prejudice in the grand jury proceedings. In dealing with the question of prejudice, we do not adopt the "harmless beyond a reasonable doubt" standard which applies to constitutional errors occurring in postindictment stages of criminal proceedings. See *Chapman* v. *California*, 386 U.S. 18, 24 (1967); *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980).[3]

We turn to the specific false statements of Detective Ahearn to the grand jury on which the defendant bases his claim that the grand jury proceedings were impaired. We shall discuss only those asserted misrepresentations to the grand jury that the defendant argued to the trial judge.[4] Of the three false

---

[3] The issue of the impairment of the grand jury proceedings does not become irrelevant simply because sufficient evidence was presented at trial to submit the case to the jury. Preservation of the integrity of the grand jury process requires an independent analysis of the propriety of the grand jury proceedings. Our rules guiding the proper presentation of evidence to a grand jury have not been expressed in constitutional terms, but the right to a grand jury indictment as to a serious crime is constitutionally based. Art. 12 of the Massachusetts Declaration of Rights. See *DeGolyer* v. *Commonwealth*, 314 Mass. 626, 627 (1943).

The opinion of the Supreme Court in *Costello* v. *United States*, 350 U.S. 359 (1956), has tended to discourage challenges to the nature and quality of grand jury evidence. The Court rejected, as not required by the Fifth Amendment to the United States Constitution (right to grand jury indictment) or warranted on supervisory grounds, a requirement that an indictment be supported by adequate or competent evidence. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Id.* at 363. "Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." *Id.* at 364. The *Costello* case did not, however, involve perjured testimony or testimony the prosecutor knew to be false.

[4] Further alleged flaws in the grand jury proceedings, argued on appeal for the first time, are not generally before us because they were not seasonably asserted. It is inherent in Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979), that each ground for a motion to dismiss must be presented to

statements on which the defendant relies, two need not detain us long. They were set forth in the defendant's motion to dismiss the indictments filed before the first trial, which the judge initially denied without prejudice to its renewal and finally denied with prejudice at the conclusion of the first trial.

. The defendant complains that Ahearn gave the grand jury the wrong cause of death. Ahearn told the grand jurors that the medical examiner had certified the cause of death as "asphyxia caused by ligature," but that the medical examiner had told him that death could have been caused by a severe blow to the neck. The medical examiner testified on voir dire during the first trial that the injuries to the victim's neck could have been caused by a log and that he had told Ahearn that the cause of death could have been a severe blow to the neck. The trial judge was fully warranted in concluding, as he impliedly did in denying the motion, that Ahearn did not intentionally, or with reckless regard for the truth, misrepresent any fact concerning the cause of death.

The defendant's second objection concerns Detective Ahearn's statement to the grand jury that semen was found in the victim's vagina. This statement, as evidence at the trials indicated, was not correct. Ahearn testified at the first trial on cross-examination that he made the statement because his superior had told him that semen had been found in the victim's vagina and because he thought a laboratory report stating that "the substance characteristically in semen showed a trace amount" meant that semen was present. Although Ahearn may have been negligent in his consideration of the laboratory report, no finding of a reckless or intentional misrepresentation has to follow in the circumstances.[5]

---

the trial judge, and any ground then known to the defendant and not presented is deemed waived. None of these new grounds presents a substantial risk of a miscarriage of justice under G. L. c. 278, § 33E.

[5] The author of the laboratory report, of which Ahearn was aware when he testified before the grand jury, testified at the second trial (but not at the first trial) that he had told Ahearn that he could not give an opinion that semen was present, but he could not remember when he did so. It would be wrong for us to find on this record that the author of the laboratory

Commonwealth *v.* Mayfield.

The testimony concerning semen in the vagina was much more critical to the rape indictment, which is no longer viable, than to the murder indictment. Moreover, the grand jury had before them several photographs that indicated forceful and abusive penetration of the victim which tended to corroborate Gallagher's version of the facts. The presence or absence of semen in the victim's vagina was thus not an important point for the murder indictment. We doubt that a finding would have been warranted that Ahearn misrepresented the facts concerning semen for the purpose of procuring the murder indictment. Certainly no such finding was required on the record.[6]

The final misrepresentation made to the grand jury is Ahearn's testimony that he found at the scene (i.e., "right in the area where the [victim's] body was found") a brown cigarette lighter with a silver top that had been in Ruiz's stolen gym bag. It is apparent from Ahearn's trial testimony that he did not find the lighter, but rather that another police officer had found it. It is also apparent that the other police officer had found the lighter in the vicinity of the body, but not "right in the area where the [victim's] body was found."[7]

report told this to Ahearn before Ahearn testified before the grand jury. Moreover, at least without having revived and renewed his motion to dismiss, the defendant may not properly rely on evidence presented at the second trial in support of his appeal from the denial of his motion at the end of the first trial.

[6] If the false testimony had been more material to the indictments than it was, the prosecutor, who learned of the error at least from an F.B.I. report (presumably received after Ahearn testified before the grand jury), might have had a duty to ask the judge to consider, after a hearing, whether the error required dismissal of either or both of the indictments.

[7] At the first trial, in his testimony as to what he found in the area where the body was found, Ahearn did not include a cigarette lighter. On cross-examination, Ahearn stated that he did not see or find a brown lighter with a silver top in the vicinity of where the body was located. When pressed as to his grand jury testimony about the lighter, Ahearn agreed that he had testified to finding the lighter "right in the area" where the body was found and admitted that he did not "personally" find the lighter. He testified further that an officer had told him within one week of the crime that a brown cigarette lighter had been found in the vicinity of the body, but he could not remember who had given him that information.

At the second trial, Ahearn listed the items he found and took from the scene of the crime. He made no reference in his direct testimony to his

The defendant did not rely on Ahearn's misstatements about the cigarette lighter in support of his motion to dismiss the indictments until the end of the first trial when he included this misstatement, along with the misstatements already discussed, in his oral argument on that motion. The defendant had not advised the Commonwealth previously that he was relying on this misstatement in support of his motion to dismiss, but the judge considered the motion again, and the Commonwealth does not now claim that it was prejudiced by its lack of notice of this asserted ground. We shall consider the argument on its merits but, because between the first and second trials the defendant did not file a new motion relying on this ground and because he did not move for or request findings of fact from the judge, we shall assume the judge found such facts in support of his ruling as the record would reasonably permit. Certainly, it is not an appropriate appellate function to find facts or to draw uncompelled inferences from the evidence.

The defendant has not proved that Ahearn knowingly testified falsely concerning the cigarette lighter, or testified in reckless disregard of the truth, on a matter that was probably significant to the grand jury's deliberations. Of course, one may infer that Ahearn knew that he had not found the lighter when he testified that he had, but the grand jury were not likely to have been influenced significantly by which police officer was said to have found the lighter.[8]

finding a lighter there. On cross-examination, he admitted that he did not find any lighter. He testified that a police officer had told him that the lighter had been found. He denied that he so testified "to enhance" the case against the defendant and testified that, when he testified before the grand jury, he had not known that the lighter had not been found in the immediate vicinity of the body.

As we have noted (see note 5 above), testimony at the second trial has no significance in a challenge to the denial at the end of the first trial of a motion to dismiss.

[8] In fairness to Detective Ahearn the prosecutor's leading and somewhat figurative question may have prompted Ahearn to say in effect that he found the lighter. The grand jury testimony was as follows:

Q.: "Okay, did you find anything at the scene there, Detective Ahearn, that you were later able to put in the gym bag that was stolen from the Dorchester House that had the sneakers in it that Val Mayfield was wearing?"
A: "Yes, I did. There was a small cigarette lighter. It was a brown lighter,

The more serious question is whether the integrity of the grand jury proceeding was impaired by Ahearn's false testimony that the lighter was found "right in the area" where the body was found. The defendant did not present evidence requiring a finding that the prosecution knew this testimony was false at the time it was given or that the prosecution was reckless in not then knowing of its falsity.[9] Ahearn testified at the first trial that between August 3 and August 9 he learned from a fellow officer that a brown cigarette lighter had been found in the vicinity of the body. He could not recall who had told him. The trial judge could credit this testimony and conclude that, although Ahearn was perhaps negligent in testifying as he did, Ahearn did not testify falsely in this respect, either intentionally or recklessly. The judge could also have concluded on the record that the grand jury would probably have indicted the defendant even if it had known that the lighter was not found right near the victim's body.

2. There was no error in the denial of the defendant's motion to suppress testimony concerning his statement and conduct during a police interrogation on August 9, 1983, at the District 11 station house in Dorchester. The defendant argues that the detectives failed to honor his right to cut off questioning. See *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975); *Miranda* v.

---

probably about an inch in width and two-and-a-half inches long, with a silver top — I believe — or black top, and later on, Mr. Ruiz identified that as being in his gym bag. That was found right in the area where the body was found."

[9] Federal cases involving claims of false representations to grand juries have generally concerned assertions of prosecutorial misconduct. To merit dismissal of an indictment in such a case, the prosecutorial misconduct generally must be not merely negligent but "outrageous or intentional" (*United States* v. *Udziela*, 671 F.2d 995, 1001 [7th Cir.], cert. denied, 457 U.S. 1135 [1982]), or "flagrant" (*United States* v. *Bettencourt*, 614 F.2d 214, 216 [9th Cir. 1980]). If perjured testimony is presented, generally an indictment may be challenged successfully only if there was no other evidence before the grand jury sufficient to support the indictment. *United States* v. *Udziela, supra. United States* v. *Adamo,* 742 F.2d 927, 938-939 (6th Cir. 1984), cert. denied sub nom. *Freeman* v. *United States,* 469 U.S. 1193 (1985). See *United States* v. *DeLeo,* 422 F.2d 487, 497 (1st Cir.), cert. denied, 397 U.S. 1037 (1970) (indictment is not impeached by the perjury of one grand jury witness).

*Arizona*, 384 U.S. 436 (1966). The judge concluded that the interrogation was not custodial and that, in any event, the defendant never invoked his right to discontinue questioning.

The conclusion that the defendant was not in custody was fully warranted on the facts found by the judge. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). Mayfield, who was then only one of several suspects, went to the police station voluntarily by prearrangement. He was told he was free to leave at any time, and he did leave at the end of the session. The interrogation was conducted in a nonthreatening, conversational manner. The detectives had no probable cause to arrest Mayfield at that time. Miranda principles apply only to custodial interrogations. *Oregon* v. *Mathiason*, 429 U.S. 492, 494 (1977). The fact that the defendant was given Miranda warnings did not make the interrogation custodial. See *Commonwealth* v. *Bryant, supra* at 737 n.8.[10]

3. The judge did not err in admitting evidence of the defendant's alleged sexual assault on the victim, and the judge acted within his discretion in excluding evidence of the defendant's acquittal of rape at the first trial. Testimony as to the defendant's conduct at the time of the commission of the crime was admissible. See *Commonwealth* v. *Harris*, 376 Mass. 201, 207 (1978). That evidence was relevant to the two theories advanced in support of a conviction of murder in the first degree, murder with deliberate premeditation and murder with extreme atrocity or cruelty. See *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984).

The fact of the defendant's acquittal on the rape charge was not relevant because he was not being tried for rape. It is, however, within a judge's discretion to admit evidence of

___

[10] The defendant's argument that he was prejudiced by the judge's failure to excise a detective's question from the early portion of the interview is without merit. A detective asked Mayfield if he had heard the standard rights given on TV, if he had had them read to him, or if he had been in court. Mayfield answered affirmatively in an ambiguously general way. This colloquy, of course, was relevant to the voluntariness of the defendant's waiver of his rights and admissible on that issue. It would have been better practice to have excised any references to the defendant's previous experience with Miranda warnings.

a defendant's earlier acquittal of a crime shown by the evidence. In certain circumstances, fairness would warrant admission of the fact of an acquittal, or perhaps the giving of cautionary instructions requested by a defendant. See *Commonwealth* v. *Mahan,* 18 Mass. App. Ct. 738, 742 (1984). On the other hand, in this case evidence of the acquittal, standing alone, might have been misleading to the jury (and unfair to the Commonwealth), and, if the judge had fully explained the possible reasons for the acquittal, any possible benefit of evidence of the acquittal would probably have been dissipated.

4. The judge did not err in certain evidentiary rulings challenged by the defendant.

a. The judge excluded the testimony of Linda McDonald, a neighborhood girl of similar age to the victim. If permitted to testify, McDonald apparently would have told of an incident between Gallagher and her, in which after she refused his request for a date, he grabbed her arm forcefully, screamed at her, punched the doorbell of her house, and ran away. Gallagher had testified that the incident had not occurred. The testimony was offered to show that Gallagher, rather than the defendant, may have killed the victim, and to impeach Gallagher's credibility.

The judge was acting well within his discretion in ruling that the alleged incident between McDonald and Gallagher was not sufficiently similar to the crime of murder to warrant its admission as having a tendency to implicate Gallagher and to exculpate the defendant. See *Commonwealth* v. *Graziano,* 368 Mass. 325, 329-330 (1975); *Commonwealth* v. *Walker,* 14 Mass. App. Ct. 544, 552 (1982). Cf. *Commonwealth* v. *Keizer,* 377 Mass. 264, 266-268 (1979). He was also justified in excluding the testimony as impeachment evidence. The general, but not inflexible, rule is that a witness may not be impeached by extrinsic evidence of prior misconduct not material to the case in which he testifies. See *Commonwealth* v. *Bohannon,* 376 Mass. 90, 93-94 (1978). The general rule applies here.

b. The defendant also claims error in the exclusion of proffered testimony of one George Gagnon. By offer of proof, the

defendant stated that Gagnon would have testified to the following. On August 2, 1983, he picked up a disheveled hitchhiker on Route 95 between Boston and Providence. The hitchhiker stated that he had just been released from prison, that he had spent the night in a park, and that he wanted to buy a gun. He also asked whether Gagnon had heard of a little girl being strangled in Boston near the water. Gagnon related the substance of his conversation with the hitchhiker to Boston police officers after he became aware of the victim's murder.

Although a police report was prepared incorporating Gagnon's statement, voir dire testimony indicated that no investigation of the hitchhiker was undertaken. Gagnon's testimony was offered to demonstrate that the police investigation into the victim's murder was inadequate. See *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980). The judge excluded the evidence as not probative of the quality of the investigation. He did not abuse his discretion in so ruling. See *Commonwealth* v. *Booker,* 386 Mass. 466, 469-470 (1982).

c. The judge permitted Anne Baker to testify as to statements Gallagher made in her presence in October, 1983. According to Baker, Gallagher revealed that he had seen the defendant murder the victim, and he reenacted the details of the crime for her benefit. As recalled by Baker, this version of the criminal incident was essentially identical to the one which Gallagher recited at trial. Although Baker's testimony was clearly hearsay, it was admitted as a prior consistent statement for the nonhearsay purpose of rehabilitating Gallagher's trial testimony. A limiting instruction was given.

Normally, prior consistent statements are not admissible to rehabilitate a witness whose testimony has been impeached by the introduction of inconsistent pretrial testimony. *Commonwealth* v. *Zukoski,* 370 Mass. 23, 26 (1976). "As an exception to this general rule, however, a witness's prior consistent statement is admissible where a claim is made that the witness's in-court statement is of recent contrivance or is the product of particular inducements or bias." *Id.* at 26-27. In the case at bar, the defendant raised the inference that Gallagher's trial testimony resulted from coercion by investigating officers dur-

ing interrogations on October 17 and 19, 1983. Thus, evidence of Gallagher's prior consistent statements was admissible to rebut the inference that Gallagher's testimony was influenced by police pressure.

5. The judge did not minimize the importance of reasonable doubt in his response to a question from the jury on the third day of their deliberations. One of the jury's questions asked for the definition of reasonable doubt in writing. In complying with that request, the judge hardly trivialized the importance of reasonable doubt. It was not error in the circumstances then to tell the jury not to focus on any particular aspect of the charge "because the whole thing was important."

6. The defendant has not shown that he was prejudiced by pretrial publicity or by the change of venue for the second trial from Suffolk County to Middlesex County rather than to Hampden County. Nor has the defendant shown that the prosecution was the source of improper pretrial publicity or that, if the prosecution had been, the conviction should be upset in the absence of a showing of prejudice.

7. The defendant argues that he should not have been retried for murder in the first degree because, based on posttrial information his counsel obtained from one juror, the first jury were deadlocked, eleven to one, for conviction of murder but only in the second degree. The claim is that in effect the first jury acquitted the defendant of murder in the first degree and that double jeopardy principles bar his retrial for murder in the first degree. There was no open and public verdict of not guilty under any aspect of the murder indictment. There was no error. *A Juvenile* v. *Commonwealth,* 392 Mass. 52, 55-56 (1984).

8. The defendant's claim, raised for the first time at oral argument, that testimony of the medical examiner was improperly admitted is meritless. Testimony that particular injuries were consistent with a particular cause was entirely appropriate. *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 437 (1974).

9. The defendant argues for relief under G. L. c. 278, § 33E, relying on the cumulative effect of the asserted errors with which we have dealt in this opinion. He does not contend that the circumstances of the crime or matters relating to the

defendant justify a reduction in the verdict of murder in the first degree. The defendant is not entitled to relief under § 33E.

*Judgment affirmed.*


LIACOS, J. (dissenting). I am persuaded that a new trial is required because this seventeen year old defendant was prejudiced by improper prosecutorial conduct during the procurement of indictments from the grand jury. I would order a new trial in the interest of justice. Accordingly, I respectfully dissent from the court's conclusion affirming the judgment of conviction of murder in the first degree. I state my reasons; in doing so, I focus only on that aspect of the court's opinion which discusses the issue of the impairment of the integrity of the grand jury proceedings leading to the indictment of the defendant. As my view of the facts shown in the record pertaining to that issue differs from that of the court, I state the relevant facts in some detail.

Kevin Gallagher and four other witnesses, among them Detective Robert F. Ahearn[1] of the Boston police department's homicide unit, were called to testify before the grand jury who indicted the defendant for rape and murder. The key witnesses before the grand jury were Gallagher and Detective Ahearn.[2]

Prior to his first trial, the defendant moved to dismiss the rape and murder indictments based on the allegedly false grand jury testimony of Detective Ahearn. The defendant took issue with two statements in particular. First, the detective testified

---

[1] The other grand jury witnesses were Guillermo Ruiz, Faustino Gomez, and Elizabeth Melendez. Ruiz related the incident involving the theft of his gym bag from the Dorchester House and his efforts to retrieve his belongings from the defendant. Gomez testified as to his fabrication of an alibi for the defendant at the request of the defendant's girl friend, the half sister of the victim. Melendez, a neighborhood youth, testified that Gomez admitted to her that he had not seen the defendant on the night of the murder but had told police officers otherwise because the defendant needed an alibi.

[2] Gallagher's story, apart from its inconsistencies, is inherently suspect to the extent that he claimed that the defendant gratuitously invited him along to witness the murder and rape.

before the grand jury that Dr. Atkins, the associate medical examiner,[3] had told him that the victim's death could have been caused by a severe blow to the neck. The defendant claimed this to be contrary to the autopsy report. Second, in response to a question whether semen was found in the victim's vagina, Detective Ahearn answered affirmatively. The defendant argued that the laboratory reports, of which the detective must have been aware, stated otherwise.[4] The judge denied the motion to dismiss, subject to reconsideration after a voir dire examination of Dr. Atkins during trial regarding the cause of death.

At the subsequent voir dire, Dr. Atkins stated that he had, in fact, told Detective Ahearn that a severe blow to the neck could have caused the victim's death. The judge again denied the motion to dismiss. The defendant indicated at that time that he might renew the motion as the trial progressed, based on the grounds previously articulated and, possibly, additional grounds.

At the close of his case, the defendant renewed his motion once more. He restated the original grounds for the motion. Moreover, he added reference to another portion of Detective Ahearn's grand jury testimony. The defendant asserted that the detective testified falsely before the grand jury in stating that in the early morning of August 2, 1983, he recovered the cigarette lighter stolen from Ruiz by the defendant "right in the area where the body was found." Detective Ahearn had

---

[3] Doctor Atkins was not called to testify before the grand jury.

[4] After performing an autopsy on the victim, Dr. Atkins gave a vaginal smear, vaginal swabs, and a rectal swab to the Boston police department crime laboratory for testing. The swabs were tested for the presence of acid phosphatase, an enzyme characteristically found in high concentrations in semen, and examined for sperm. The laboratory report indicates that the rectal swab tested positive for acid phosphatase, while the vaginal swabs showed only trace amounts of the enzyme. No sperm was detected on the swabs or on the vaginal smear.

The swabs were forwarded to the Federal Bureau of Investigation (F.B.I.) laboratory in Washington, D.C., and were tested again. The F.B.I. laboratory report states that the rectal swab tested trace positive for acid phosphatase, but negative with regard to the presence of sperm or prostatic antigen. It further states that no semen was found on the vaginal swabs.

admitted, at trial, that he did not find a lighter when searching the area where the victim's body was found. Other trial testimony indicated that another police detective, Gerard Seeley, found a lighter some distance from the site of the murder.[5]

The judge denied for the third time the motion to dismiss the indictments, stating that his latest ruling was "based on all the evidence which has been presented to the Court in the way of both affidavit and evidence during this case."[6]

The issue before us, then, is whether Detective Ahearn's testimony before the grand jury relative to the cause of the victim's death, the presence of semen in her vagina, and the

---

[5] As previously noted, witnesses testified that, except for Ruiz's sneakers, the defendant cast the gym bag and its contents aside by the wall of the abandoned school yard. The bag contained sneakers, clothing, and various personal effects, including a disposable cigarette lighter. Some of the discarded items were taken by others, while other items were left undisturbed. Detective Seeley testified that he conducted a search of Ronan Park on August 2, 1983, and recovered, next to the school yard wall, a number of items that had been in Ruiz's bag. He found the cigarette lighter in another location, however.

[6] After the trial ended in an aquittal on the rape indictment and a mistrial as to the murder indictment, the defendant was retried on the original murder indictment before the same judge who presided over the first trial. The defendant did not renew his motion to dismiss the indictment at the second trial, nor, in the circumstances, do I think he was obligated to do so to preserve his appellate rights.

In addition to the alleged falsity of Detective Ahearn's grand jury testimony already outlined, the defendant now asserts that the grand jury presentation was fatally flawed in other respects. The defendant claims that Detective Ahearn distorted the facts by testifying that the defendant avoided the investigating police officers after the murder, and by failing to inform the grand jurors of the many occasions on which the defendant spoke with various police officers. The defendant also complains that the prosecutor misled the grand jury by withholding presentation of certain facts which, in varying degrees, cast doubt on the veracity of Gallagher's eyewitness testimony. Finally, the defendant contends that the prosecutor acted improperly in presenting Faustino Gomez's testimony as to a contrived alibi without eliciting a disclaimer that the alibi was fabricated without the defendant's knowledge or consent.

I agree that the court need not consider these additional grounds (see *ante* at 622 n.4) because the defendant has waived review of these grounds by failing to present them to the trial judge. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979); *Commonwealth* v. *Sawyer,* 389 Mass. 686, 692 (1983).

detective's discovery of the cigarette lighter at the murder scene, either singly or in the aggregate, constitutes sufficient grounds for dismissing the murder indictment.

Ordinarily, "a court should not inquire into the adequacy or competency of the evidence upon which an indictment is based. . . . However, when it appears that the integrity of the grand jury process has been impaired, a defendant may attack the validity of the indictment by way of a motion to dismiss. . . . There can be no doubt that the knowing use by the Commonwealth *or one of its agents* of false testimony to procure an indictment is a ground for dismissing the indictment" (emphasis supplied). (Citations omitted.) *Commonwealth* v. *Salman,* 387 Mass. 160, 166 (1982). See *Commonwealth* v. *Reddington,* 395 Mass. 315, 319 (1985); *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 338 (1983). This principle of law was born of a "fastidious regard for the honor of the administration of justice," *United States* v. *Basurto,* 497 F.2d 781, 787 (9th Cir. 1974), quoting *Mesarosh* v. *United States,* 352 U.S. 1, 14 (1956), which is undermined when a defendant is put to trial on an indictment which the Commonwealth knows is based in whole or in part on false testimony.

The Commonwealth contends that Detective Ahearn's grand jury testimony was based in good faith on information provided to him by others. This assertion is plausible only in so far as it concerns Detective Ahearn's statements about the cause of the victim's death. Based on Dr. Atkins's voir dire testimony, the judge was warranted in concluding that Detective Ahearn testified truthfully when he stated that he was told by Dr. Atkins that the victim's injuries were consistent with a severe blow to the neck. Nevertheless, a proper review of the record should convince us that the detective gave knowingly false testimony with respect to the presence of semen and the cigarette lighter.[7]

Detective Ahearn stated without equivocation at the grand jury proceeding that semen was found in the victim's vagina.

[7] The court's assumption, *ante* at 625, that the judge implicitly "found such facts in support of his ruling as the record would reasonably permit" disregards the clear import of the evidence, as well as overlooks the possibility that the judge's ruling was based on error of law.

He testified at trial that he based this conclusion on the Boston police department laboratory report and on information relayed to him by a superior officer. The laboratory report was at best inconclusive, however, stating only that trace amounts of acid phosphatase were found on the swabs tested. See note 4, *supra*.[8]

On cross-examination at both trials, Detective Ahearn professed to having little knowledge at the time of his grand jury appearance of the scientific principles underlying the acid phosphatase test for semen. He stated, in essence, that he was unaware that a positive finding for acid phosphatase was not equivalent to a positive finding of semen.[9] This claim must be compared with the testimony of Stanley I. Bogdan, senior criminalist with the Boston police crime laboratory. Bogdan conducted the tests on the vaginal and rectal swabs taken from the victim and prepared the report on which Detective Ahearn purportedly relied when testifying before the grand jury.

Bogdan testified that he spoke with Detective Ahearn after the laboratory report was completed and told him that trace amounts of acid phosphatase were found on the swabs. He informed Detective Ahearn that acid phosphatase is an enzyme found in high concentrations in semen, but noted that it is found in other body fluids as well. Most importantly, Bogdan testified, without contradiction, that he told Detective Ahearn, based on his findings, he could not give an opinion that semen was present on the vaginal swabs. Thus, Detective Ahearn's statement to the grand jury was in direct contradiction to what he had been told by the person most competent to interpret the test results. A fair reading of this evidence is that Detective Ahearn was aware of the falsity of his answer regarding the presence of semen in the victim's vagina.[10]

---

[8] The F.B.I. laboratory report, which was dated October 20, 1983, the day before Detective Ahearn appeared before the grand jury, clearly stated that no semen was present on the vaginal swabs. It is not apparent whether Detective Ahearn examined that report before testifying before the grand jury. He stated at the second trial that he did not.

[9] Some skepticism of this claim might arise from Detective Ahearn's status as a sixteen-year veteran of the police force.

[10] In light of Bogdan's testimony, this case is not factually similar to *Commonwealth* v. *Reddington, supra*. There, field tests conducted on two

Additionally, there can be no question that Detective Ahearn's testimony with respect to the cigarette lighter was a deliberate prevarication. The detective told the grand jury that he, *personally*, found a cigarette lighter right in the area where the victim's body was discovered. This was patently untrue. In explanation of his grand jury testimony, Detective Ahearn stated at trial that it was related to him (by an officer whose identity he could not recall) that a cigarette lighter belonging to Ruiz was recovered in the area of the body. Detective Seeley's trial testimony, see note 5 and accompanying text, *supra*, is to the contrary. Detective Seeley stated that he had picked up a cigarette lighter by the backstop of a baseball diamond near the street side of the park. He characterized this location as being in the vicinity where the body was found. This testimony does not advance the Commonwealth's cause, because it does not answer the charge that Detective Ahearn falsely claimed to have retrieved the cigarette lighter himself.[11] Nor does it explain Detective Ahearn's statement that the lighter was found next to the victim's body, which was the clear import of his grand jury testimony. Regardless of Detective Seeley's post hoc characterization of the location of the lighter

---

substances found at the defendant's home indicated that they were opium and cocaine. This information was relayed to the arresting officer who testified to that effect at the grand jury. Laboratory analysis completed after the officer testified revealed, however, that the substance thought to be opium was nonnarcotic, as was most of the substance thought to be cocaine. The court held that the defendant's motion to dismiss the indictments against him was properly denied because there was no showing that the testifying officer knew, or should have known, that the testimony was inaccurate; he was merely restating in good faith what another experienced officer had told him. *Id.* at 319-320.

Contrast the instant case. Here Detective Ahearn claims that his superior told him that semen had been found on the vaginal swabs. The person who conducted the tests testified, without contradiction, that he told the detective that he could reach no such conclusion.

[11] The Commonwealth theorized at oral argument that, when using the pronoun "I" in the relevant statement, Detective Ahearn was referring to the Boston police department and its individual members as a unitary whole. This explanation is utterly implausible.

relative to the murder scene, it is clear that it was not found in the immediate area of the victim's body.[12]

It seems clear to me that an agent of the Commonwealth made knowingly false statements before the grand jury who indicted the defendant. In *Commonwealth v. Bongarzone*, 390 Mass. 326, 338 (1983), however, we made clear that an indictment need not be dismissed if deliberately falsified testimony was not calculated to procure it. Thus, we focused on the motive of the police officer for presenting fabricated testimony. Other courts have spoken of the materiality of the false testimony when determining whether an indictment must be dismissed. See, e.g., *Commonwealth v. Ward*, 17 Mass. App. Ct. 985, 985-986 (1984); *Commonwealth v. Edgerly*, 13 Mass. App. Ct. 562, 578 (1982); *United States v. Flaherty*, 668 F.2d 566, 584-585 (1st Cir. 1981); *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). The concept of materiality is related directly to the motive to falsify, such that it may be inferred generally that when a grand jury witness gives deliberately false and material testimony he has done so in an effort to help procure an indictment.[13]

Both of the false statements by Detective Ahearn were material; each, to some degree, advanced the Commonwealth's cause. The detective's assertion that semen was found in the victim's vagina lent credibility to Gallagher's eyewitness account of the murder because it provided corroboration for his assertion that the victim had been raped. Detective Ahearn's testimony regarding the cigarette lighter was of even greater importance, for it provided the only physical evidence linking

---

[12] None of the police reports contained in the record detailing the items recovered from Ronan Park by police officers following the murder makes any reference to a cigarette lighter. Detective Seeley testified that the cigarette lighter which he found was not submitted to Bogdan for analysis, although he did submit a number of other items which were designated as having been found in the vicinity of the body.

[13] There is a caveat to this generalization, based on the unique facts of *Commonwealth v. Bongarzone, supra*. In that case, although the police officer's knowingly false grand jury testimony was material, it was also exculpatory. Consequently, we concluded that the false testimony was not intended to procure an indictment.

the defendant to the murder scene. This testimony, too, was corroborative of Gallagher's story.

Nevertheless, the court concludes that the murder indictment should not be dismissed because there has been no showing of actual prejudice to the defendant. To reach this conclusion, the court relies, without basis, on supposed implicit findings by the trial judge without considering whether the judge erred as matter of law as to the import of the uncontradicted and clear evidence of mendacious testimony given to the grand jury by Detective Ahearn. One cannot help but feel that what the court really is holding is that, since there was a conviction by a trial jury, the impairment of the grand jury's function should be ignored. Cf. *Talamante* v. *Romero,* 620 F.2d 784, 791 (10th Cir.) (stating that perjured grand jury testimony was "immaterial" because it was recanted at trial and did not affect conviction, and because it is unlikely that grand jury would have failed to indict, given petit jury's guilty verdict after full trial), cert. denied, 449 U.S. 877 (1980).

In my view, this court should condemn the deliberate presentation of false grand jury testimony, not just because such testimony impairs the grand jury's ability to perform their historic function of "protecting citizens against unfounded criminal prosecutions," *Branzburg* v. *Hayes,* 408 U.S. 665, 686-687 (1972), but also because of our abiding commitment to a principled system of criminal justice. That commitment entails a concern for procedural fairness and the maintenance of an equitable balance of adversary power between the State and the accused. See Arenella, Rethinking the Functions of Criminal Procedure: The Warren and Burger Courts' Competing Ideologies, 72 Geo. L.J. 185 (1983). Consonant with such concerns, we should not permit an indictment to stand where an agent of the Commonwealth has given knowingly false testimony before the grand jury for the purpose of ensuring the return of that indictment.[14]

---

[14] To do otherwise would effectively insulate the Commonwealth from accountability for knowing and deliberate improprieties at the grand jury stage of proceedings, provided those improprieties were not repeated at trial. To accept such a theory would render the protections against unjust indictments a nullity.

Proper concern for protecting the integrity of the judicial process requires that the defendant's conviction be overturned and the indictment be dismissed. *Commonwealth* v. *O'Dell,* 392 Mass. 445, 446-447 (1984). *Commonwealth* v. *Salman,* 387 Mass. 160, 166 (1982). *Commonwealth* v. *McCarthy,* 385 Mass. 160, 162 (1982). Cf. *Commonwealth* v. *Reddington,* 395 Mass. 315, 320 (1985) (no showing Commonwealth or police officer knew, or should have known, grand jury testimony was false); *Commonwealth* v. *Bongarzone, supra* at 338 (no showing police officer testified falsely in order to procure indictment); *Commonwealth* v. *Ward, supra* (no showing Commonwealth knew grand jury testimony was false; testimony was also immaterial); *Commonwealth* v. *Edgerly, supra* at 578-579 (same).

A conclusion that the indictment should be dismissed would not preclude the Commonwealth from obtaining a new indictment and proceeding to another trial. See *Eubanks* v. *Louisiana,* 356 U.S. 584, 589 (1958) (no double jeopardy bar to reindictment and retrial of defendant whose conviction and underlying indictment were dismissed for unconstitutional exclusion of blacks from grand jury). See also *United States* v. *Ball,* 163 U.S. 662, 672 (1896). Our cases indicate that whether an indictment should be dismissed without opportunity for retrial on the basis of police or prosecutorial misconduct "turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the impropriety." *Commonwealth* v. *Lam Hue To,* 391 Mass. 301, 312-313 (1984). Although in *Commonwealth* v. *Manning,* 373 Mass. 438, 443-444 (1977), we dismissed an indictment with prejudice where the misconduct of police officers, directed toward undermining the defendant's relationship with his attorney, "was so pervasive as to preclude any confident assumption that proceedings at a new trial would be free of the taint," there is no such problem in the instant case. In my view, the proper course would be to dismiss the indictment without prejudice.

In closing, I am mindful of the emotional hardships which the victim's family, the trial witnesses, and the defendant himself already have endured through the course of two lengthy

trials, and of the expense of such proceedings to the Commonwealth. It is with reluctance that I would consign the various participants to the possibility of yet a third trial. The court should do so, however, in the firm belief that only by demanding scrupulous adherence by public officials to principles of fundamental fairness can our criminal justice system maintain its moral legitimacy and hope to command the respect of the citizenry.[15] Accordingly, I dissent.

---

[15] The defendant has charged the prosecutor with "playing an ignoble part" in the presentation of false testimony to the grand jury. See *Commonwealth* v. *Lincoln,* 368 Mass. 281 285 (1975). It is unnecessary to consider the validity of this particular allegation. I note, however, that the charge does not appear wholly unfounded on the record before us. Prosecutors have an ethical duty to request the dismissal of an indictment if they become aware, even after the fact, that false testimony was used to obtain it. See *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 339 n.10 (1983); *Commonwealth* v. *Salman, supra* at 167. Rule 3:08, PF 12, of the Rules of the Supreme Judicial Court, as appearing in 382 Mass. 802 (1981) provides: "It is unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or to fail to seek withdrawal thereof promptly *upon discovery of its falsity"* (emphasis supplied). By the end of the first trial, at least, it was clear that false material evidence had been submitted to the grand jury.