Macdonald, D. Lloyd, J.
In an order dated July 9, 2008 (Paper #27) the Court denied the defendant’s motion to dismiss that had been based on Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). The Court found that the grand jury minutes reflected sufficient evidence to establish probable cause that the defendant had committed second degree murder. However, the Court further ordered the parties to brief whether “the integrity of the grand jury proceeding may have been impaired by an unfair and misleading presentation to the grand jury of statements attributed to the defendant without revealing contemporaneous exculpatory statements of the defendant to the interrogating officers.” In doing so, the Court expressed its concern that the principles articulated in Commonwealth v. Salman, 387 Mass. 160 (1982), Commonwealth v. O’Dell, 392 Mass. 445 (1984), and Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986), may have been transgressed.
The Court has now reviewed the briefs of the parties and has reexamined the totality of the record.[1] The Court now orders that the indictment be DISMISSED for the reasons stated below.
Legal Standard
In Commonwealth v. Salman, 387 Mass. 160 (1982), the SJC stated, “It is the general rule that a court should not inquire into the adequacy or competency of the evidence upon which an indictment is based. However, when it appears that the integrity of the grand jury process has been impaired, a defendant may attack the validity of the indictment by way of a motion to dismiss.” Id. at 166. And in Commonwealth v. O’Dell 392 Mass. 445 (1984), the SJC found dismissal appropriate where “the integrity of the grand jury proceeding was impaired by an unfair and misleading presentation to the grand jury of a portion of a statement attributed to the defendant without revealing that an exculpatory portion of the purported statement had been excised.” 392 Mass. at 447.
To secure a dismissal, a high standard must be met. There must be a demonstration that the tainted evidence was presented knowingly or with reckless disregard of the truth with the intention of securing an indictment and that such evidence “probably influenced the grand jury’s determination to hand up an indictment.” Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986). “This requires a showing not only that the evidence was material to the question of probable cause but that, on the entire grand jury record, the false or deceptive testimony probably made a difference.” Id. at 621-22.
*623 A prosecutor is not required to present all available exculpatory evidence to the grand jury. O’Dell., 392 Mass. at 447. However, the Commonwealth cannot withhold certain portions when to do so results in a distortion of the evidence. Commonwealth v. Levesque, 436 Mass. 443, 447 (2000). “Otherwise stated, it is when the prosecutor possesses information that would gravely undermine evidence supporting probable cause that the prosecutor is duty bound to furnish it to the grand jury.” Commonwealth v. Biasiucci, 60 Mass.App.Ct. 734, 738 (2004).
Discussion
As noted in the Court’s earlier decisions, this case arises from the death of William Casavant (“Casavant” or the “victim”) on November 2, 2003. The defendant and Casavant lived together in Fall River. Theirs was a chronically dysfunctional and violent relationship. They met in year 2000 while both were in a Rhode Island alcohol detoxification and treatment program. The relationship was marked by Casavant’s repeated physical violence against the defendant. Before the defendant’s November 2, 2003 emergency 911 call that gave rise to the case, the Fall River Police had responded at least seven times to domestic violence calls to the defendant’s and Casavant’s residence. Most of such calls resulted from reports by neighbors or by the defendant’s family who were concerned for the defendant’s safety.
The Commonwealth does not contest this history of abuse by the victim. The videotapes of the police interviews on the day of Casavant’s death show a severe bruise on the defendant’s chin, which she described as having been caused by Casavant having attacked her on Halloween, two days prior to his death. (The Commonwealth introduced the complete videotape record of the interviews as exhibits before the grand jury.) Further, at the grand jury the District Attorney introduced evidence that documented the complete history of the Fall River Police Department’s responses to the domestic violence calls to the Casav-ant/Ferreira household.
As noted, the authorities became involved in this case following the defendant’s 911 call for assistance on November 2, 2003. That evening the defendant was interviewed at the Fall River Police Department by Fall River Detective Thomas Chace (“Chace” or “Detective Chace”) and by Massachusetts State Police Trooper William Serpa (“Serpa” or ‘Trooper Serpa”). She was further interviewed the following afternoon and early evening. As referenced above, the Court has ruled that the defendant’s statements given in the course of those interviews were given voluntarily and after her Miranda rights were knowingly and voluntarily waived.
In combination with the physical and medical evidence that suffocation was the cause of Casavant’s death, the statements attributed to the defendant by the interrogating officer who testified at the grand jury provided the basis of the grand jury’s second degree murder indictment. Specifically, the interrogating officer related to the grand jury on two occasions that the defendant had stated to him and the other officer present that as she held the pillow over the victim’s face, “all her fear and anger [from prior physical abuse by the victim] was coming out.”
The question by the District Attorney and answer by the officer on the second occasion of the testimony to the grand jury was:
17. Did [the defendant] say how she was feeling when she was doing that, when she was holding the pillow down [over the victim’s face]?
A. Yes. She made the same statement to us as she had the prior evening while the search was being conducted at her apartment, that all her fear and anger was coming out while she was doing that.
This was, without question, highly material incriminating evidence with regard to the mens rea necessary for second degree murder and its distinguishing elements from manslaughter. See, e.g., Commonwealth v. Sama, 411 Mass. 293, 298 (1991), and Commonwealth v. Vizcarrondo, 427 Mass. 392, 396 (1998). The grand jury could be expected reasonably to have acted on it. However, from the Court’s review of the videotaped interrogation, at no time did the defendant utter those words or their substance as an affirmative statement. Instead, while the defendant eventually acknowledged that she had held the pillow “hard” over the victim’s face, she maintained to the end that she “did not do it to hurt him.” The Court’s earlier detailed findings of fact in its January 2, 2008 memorandum and order as they related to the facts and circumstances surrounding the defendant’s statements to the police are directly pertinent:
The defendant’s initial version of events as related to the officers was that on the morning in question Casavant had been heavily drinking and had threatened to kill himself by ingesting a large number of pills. She further informed them that he had vomited and fallen from his bed in a stupor. She described cleaning him up but being unable to move him from the floor. The defendant reported that she then left him for about a half hour and upon her return found that he wasn’t breathing. She attempted CPR, she claimed, but to no avail, at which point she promptly called 911.
From the outset, Chace and Serpa were skeptical of the defendant’s story, and they had good reason to be so. First, the responding EMT’s had informed Officer Roderiques at the scene that Casavant had likely been dead far longer than as described by the defendant. (Rigor mortis had begun to set in.) More significantly, before their first interview of the defendant, Chace and Serpa had been advised of the assistant medical examiner’s preliminary conclusion that Casavant had been forcibly suffocated. This preliminary determination of cause of death *624 was confirmed early on November 3rd [the day after Casavant’s death] by the Medical Examiner after performing an autopsy. And immediately adjacent to where Casavant was found dead on the floor was a bedrest pillow that could have been the instrument of his suffocation.
However, for almost five hours of interrogation over two days the defendant repeatedly denied amemoiy of having done so.
During the course of the interviews, Chace and Serpa were visibly frustrated and returned again and again to the implausibility of the defendant’s story in light of Casavant’s physical condition and the autopsy results. The officers used various approaches to induce the defendant to change her account.
Throughout, as noted, they were sympathetic and overtly so. For example, they repeatedly characterized her as the “victim”; they related that they understood that she had been frightened for her life, and they told her that they believed that if Casavant had woken up, he would have beaten and perhaps killed her.
After the assistant medical examiner’s preliminary opinion was known but before the Medical Examiner’s final autopsy results were received, Chace and Serpa warned the defendant that “this was the only time we can help you.” They told her that after the autopsy results were received the next day, it would be too late for her to get the benefit of telling the truth. They informed her that they believed she was “frightened for [her] life” and that she could “explain [Casavant’s death] to make it justifiable.” They offered to go to the District Attorney on her behalf if she described events as they believed they had occurred. And Detective Chace physically acted out how he surmised that the defendant had placed the pillow over Casavant’s face and held it down. Notwithstanding the officers’ efforts, the defendant, sometimes in tears, repeatedly reaffirmed that she had no memory of having suffocated Casavant.[2]
As noted, on November 2nd after approximately three hours of questioning, the defendant was permitted to leave the station where the interrogation took place. On request of the officers, she returned to the station in the mid-afternoon of November 3rd. After being apprised of her Miranda rights again, she again agreed to waive them and again executed a waiver form to that effect. The interview resumed along the same lines as the day before. By this juncture, however, the final autopsy results were in hand, and Serpa and Chace used those results to leverage what they described as the incredibility of the defendant’s story. For some time, she stuck to the essence of her account, but eventually she acknowledged having placed the pillow on Casavant’s face. In doing so, though, she emotionally denied having put any pressure on the pillow.
An hour and a half into the November 3rd interview, Serpa returned to the autopsy findings and told the defendant that he was convinced that it was an accident, a “panic thing” she did. Then, in a barely audible voice, the defendant admitted, “I did hold him down, but not for long.” As to why, she said, “I thought that he was going to kill me.”
Serpa and Chace then unsuccessfully attempted to get further incriminating details from the defendant. They were frustrated by her saying that she held the pillow on Casavant’s face for no more than 10 seconds and that she did not intend to hurt him. They suggested that she take a break, noting that she appeared to be “confused.” However, when the interview resumed (again, after further Miranda warnings), she maintained her account that while she “held” the pillow over Casavant’s face, she did not do so with such force and over such a time as to have killed him.
In the light most favorable to the Commonwealth, the crux of the defendant’s statements as to what she did to Casavant and as to her intentions in doing so is that she placed the pillow “hard” over Casavant’s face for no more than ten seconds and that in doing so she did not intend to kill him. Further, she stated that she thought that Casavant “was going to kill me.” This contrasts starkly with the testifying officer’s twice repeated unqualified testimony in answers to questions posed by the Assistant District Attorney that in placing the pillow intentionally over Casavant’s face, “all her fear and anger was coming out.” The latter statement clearly implies a deliberate act intended to suffocate the victim. The defendant did not utter such a statement or the substance of it.
To be sure, the defendant’s eventual acknowledgment that she did forcibly put the pillow on Casavant’s face was incriminating, but at most — when combined with her repeated statements that she did not intend to harm Casavant — it directly posed the issue as to whether her conduct comprised manslaughter or murder.
The indecisive nature of the defendant’s incriminating statement can be inferred from the continuing frustration of the interrogating officers when she made it. Rather than to express their relief, respect and/or gratitude in her finally having admitted to what for the five previous hours over two days the officers had persistently been attempting her to admit, they suggested that she take a break because she still appeared to be “confused.” Had the defendant, in fact, testified as the officer told the grand jury, the interrogation would have been over because the officers would thereby have secured her decisive admission.
As noted, the complete videotape of the defendant’s interrogation was introduced as an exhibit before the grand jury. Accordingly, it would normally be reason *625 able to assume that the jury, with such access, availed itself of the opportunity to observe the tapes and make its indictment decision independent of the testifying officer’s characterization of what the defendant said or did not say. However, the tapes’ audibility was frequently poor, and at the critical juncture of the defendant’s admission as to having placed the pillow over Casavant’s face, her voice was almost inaudible.
The Court knows this from its own review of the tapes. The Court repeatedly had to wind and rewind the subject portion of the tape before being confident of its understanding of what the defendant had in fact said. Under such circumstances, it is extremely unlikely that the jury availed itself in fact of the opportunity to scrutinize the record sufficiently to have a basis to judge the import of the defendant’s statement independent of the testifying officer’s twice repeated version.
Further, it is apparent from the grand juiy minutes and the jurors’ questions recorded there that the jury focused on what precisely the defendant stated while being interrogated about having “held down” the pillow on Casavant’s face. It was logical for the juiy to have done so, and there were three juror questions on the issue. At no time did the testifying officer depart from his characterization of the defendant’s having intentionally held the pillow down over Casavant’s face as “all her fear and anger were coming out.”
While, of course, the Court cannot be certain as to what the grand juiy did or did not do with the evidence, the Court can be certain, on the complete record before it, that the risk of material prejudice to the defendant from the officer’s misleading testimony was tangible and compelling because that testimony so directly related to the defining element of murder.
The Court concludes that the integrity of the grand juiy proceeding here was impaired by an unfair and misleading presentation as to the defendant’s statement of her state of mind as she allegedly placed the pillow over the victim’s face. O’Dell 392 Mass. at 447. It was further impaired because the testifying officer ignored material exculpatoiy portions of her testimony and thus kept the exculpatory evidence from the grand juiy. Id. The result was that the evidence was materially distorted. Levesque, 436 Mass. at 447. The officer’s testimony was made with reckless disregard of the truth and with the intention of securing a murder indictment, and his testimony “probably influenced the grand juiy’s determination to hand up an indictment.” Mayfield, 398 Mass. at 621.
ORDER
The defendant’s motion to dismiss is ALLOWED. The defendant’s indictment for second degree murder is DISMISSED.

This is the fourth occasion for the Court to address issues arising from the case. The Court’s first involvement was in ruling on the Commonwealth’s motion to find the defendant competent to stand trial. After a two-day hearing, the Court held that the defendant was competent. See the Court’s Memorandum and Order on the Defendant’s Competency to Stand Trial, dated August 14, 2007 (Paper #20). Thereafter, the Court heard and denied the defendant’s motion to suppress statements. That motion was predicated on the theory of her involuntary waiver of her Miranda rights and the involuntary nature of her statements generally. See Commonwealth v. McGee, 423 Mass. 381, 387 (1996). The Court’s decision in that regard appears in the record as Paper #25. As noted above, the Court then heard and denied the defendant’s McCarthy motion. Paper #27. To the extent relevant to the issues now before the Court, the exhibits entered in those proceedings and the findings made there are incorporated herein.

In ruling on the defendant’s motion to suppress the Court addressed whether the officers’ interrogation techniques violated the defendant’s rights:
The approach that Serpa and Chace employed in the first interview whereby they stressed to the defendant that she should admit to having suffocated Casavant then because after the autopsy results were in the next day, it would be too late for her to get benefit from her admission came perilously close to the “now or never" line of interrogation explicitly disapproved by the SJC in Commonwealth v. Novo, 442 Mass. 262, 267-69 (2004) (the SJC found that the representation there was “plainly untrue” and comprised a “particularly egregious intmsion on rights that Article 12 declares to be fundamental”). However, the defendant here did not change her stoiy in response to the officers’ line.
Further, while the officers’ questioning was persistent and pointed and while it employed “minimization” techniques also found to be impermissible in other reported cases, see e.g., Commonwealth v. DiGiambattista 442 Mass. 423, 435 (2004), the Court is convinced that the defendant’s eventual acknowledgment of having forcibily placed the pillow over Casavant’s face did not result from her will having been overborne. The defendant remained cognitively engaged throughout the course of the interviews, especially during the key episodes of the November 3rd interview. She was in contact with her surroundings, with the content of the questioning and with the meaning and significance of her answers.
Memorandum and Order on the Defendant’s Motion to Suppress Statements (January 2, 2008) at 6-7.