Garsh, E. Susan, J.
The defendant, Simeon Coleman (“Coleman”), has been charged, pursuant to indictments handed down by a Bristol County Grand Juiy, with trafficking in cocaine pursuant to G.L.c. 94C, §32E (b)(3), trafficking in cocaine within one thousand feet of a school zone pursuant to G.L.c. 94C, §32J, and conspiracy to traffick in cocaine pursuant to G.L.c. 94C, §40. Now before this court are the defendant’s two motions to dismiss on the basis that the grand juiy had insufficient evidence to warrant the issuance of the indictments and on the further basis that the integrity of the grand juiy proceeding was impaired by the presentation of distorted evidence. For the reasons set forth below, the defendant’s motion predicated on the insufficiency of the evidence is DENIED, and the defendant’s motion predicated upon impairment of the integrity of the grand iury proceeding is ALLOWED.
FINDINGS OF FACT
The following information was presented to the grand jury by Detective Manuel Bernardo (“Bernardo”).
On October 8,2004, the New Bedford Police Department executed a search warrant for the second-floor north premises located at 103 O’Grady Street, New Bedford, Massachusetts. That was the residence of Kendra Belisle (“Belisle”), the target of a police investigation. For a short period before executing the warrant, police surveilled the residence.
During the surveillance, Bernardo observed an automobile driven by Belisle arrive. After she exited the car, in front of the residence she met up with a black male, later determined to be Coleman. Bernardo believed Coleman to have arrived by bicycle. The two went into 103 O’Grady Street together.
A short time later, a car driven by Kenneth Holloway arrived (“Holloway”). Holloway also went into 103 O’Grady Street.
At approximately 7:00 PM, the police executed the warrant. As they reached the second-floor landing, the police heard people talking inside the apartment. Bernado knocked on the front door and announced “police, search warrant,” following which it became quiet in the apartment and then voices of people “kind of running and shouting cops” could be heard. Bernardo ordered that the door be forced open.
Upon entiy, Bernardo observed the defendant and another male, later identified as Louis Whitehead, sitting on a couch in the living room. He observed Holloway run into the bathroom, and he saw Belisle and a white male, later identified as Carl Dias (“Dias”), run into the bedroom. Bernardo grabbed Dias; before he did so, Bernardo saw Dias throw a clear plastic bag containing a white substance to the ground.
A coffee table stood in front of the couch where Coleman and Whitehead had been sitting when the police entered. On the table, in plain view, were two boxes of sandwich bags, baking soda, scales, four cell phones, a plate with a spoon containing cocaine residue, and a plastic bag containing approximately 125 grams of powder cocaine. Three of the persons arrested claimed ownership of the cell phones. Coleman was not one of the three. More than four persons were arrested. No one claimed ownership of the fourth phone.
On the floor of the living room, the police found nine sandwich bags with the comers cut off, as well as another scale and two plastic bags containing a small amount of marijuana. On top of the living room entertainment center were four letters addressed to Belisle at 103 O’Grady Street. Among other things, a search of the kitchen turned up several empty boxes of baking soda, an empty box of sandwich bags, a plate with a razor in it with cocaine residue, a measuring cup with cocaine residue, and a plate with cocaine residue. In the bedroom, police found a small plastic bag containing 2.2 grams of crack cocaine in the area where Bernardo had observed Dias throw an item to the ground, four cell phones, letters addressed to Belisle, and a shopping bag containing sixty glassine bags of heroin.
After the search, eveiyone in the apartment was placed under arrest and transported to the station by marked police cruisers. At the station they were searched. Belisle had $43 and two bags containing crack cocaine on her person. Whitehead had $180, Dias had $623, and Coleman had $102.
Bernardo testified that Coleman was transported by Officer Jimmy Elumba, but then changed his testimony to indicate that the transportation was by Officer James Smith.[1] The officer who transported Coleman told Bernardo that, after he had dropped Coleman off, he checked the rear seat where Coleman was seated, and he found a clear plastic bag containing crack cocaine. The officer gave the cocaine to *450 Bernardo.[2] The bag contained nine individual small pieces of crack cocaine.
Asked to state the Department’s policy with respect to what occurs in connection with the transportation of an arrestee, Bernardo testified that the Department’s policy is to check the cruiser at the start of a shift to make sure that there is nothing in the back seat. He then gratuitously added: “That way in this instance, like if something was found after transport, that person owns it. It’s his. And [the transporting officer] stated that he did that. He searched his cruiser before the transport. He searched it again, and then after the transport he searched it, and he found the bag with crack cocaine.” Asked whether it was found in between the seat and the back, Bernardo did not answer the question asked. Instead of stating that the cocaine had been found on the floor of the cruiser, Bernardo responded, “Actually, it’s a hard plastic seat. There’s no cushion, so it’s right, visibly right there.”
There is an elementary school approximately seven hundred feet from 103 O’Grady Street.
Bernardo did not inform the grand jury that Dias was transported along with Coleman in the back seat of the cruiser.
The grand jury heard no evidence that any personal belongings of Coleman or papers containing his name or mail addressed to him were found in the apartment at 103 O’Grady Street. The grand jury heard no evidence that Coleman had ever previously been seen entering or leaving O’Grady Street or associating with any of the other defendants. The grand jury heard no evidence that Coleman had made any incriminating statement or had engaged in any behavior from which an inference of consciousness of guilt could be drawn.
Based on all the evidence adduced at the eviden-tiary hearing and the reasonable inferences drawn from that evidence, the court finds the following facts.
During pre-raid surveillance, Bernardo, who was the lead detective, observed the defendant enter the multi-family dwelling at issue with the target of the search warrant. Within approximately fifteen minutes of his arrival, the police executed the search warrant. The defendant was not the target of the search warrant.
Bernardo personally observed Dias run into a bedroom and attempt to discard contraband. Dias was handcuffed and brought into the living room. He was not then searched. All the occupants of the apartment were arrested. Other than a pat-frisk for weapons, none of the defendants were searched at the premises. No contraband was removed from the person of any of the defendants at the premises.
Dias and Coleman were placed into the back of the same cruiser. Both were handcuffed behind their backs when placed into the cruiser. The defendant sat in the rear behind the driver, and Dias sat in the rear passenger side. Bernardo knew that the defendant and Dias were being transported together in the same cruiser. The defendant is an African-American: Dias is not.
The cruiser’s back seat is made of molded plastic. It is one unit with an impression in the rear for cuffed hands. There is no physical separation between the passenger’s side and the driver’s side of the back seat. The rear floor has a small transmission hump in the middle that would not preclude items from being kicked or pushed with a foot from one side of the floor to the other.
Officer Thomas Faris (“Faris”) drove the cruiser containing the defendant and Dias. During the ride, Faris noticed no movement by either of the individuals in the back seat of the cruiser. Before the men were placed in the cruiser, Faris inspected the seat and floor for contraband. Nothing was found.
After the two men were removed from the cruiser, Faris again checked the rear area. On the floor behind the driver’s seat, he found a bag containing cocaine. Faris located Bernardo, gave him the bag and told Bernardo that he had found it on the floor in the rear where the black male had been seated.
No fingerprints were developed on any of the items processed. Bernardo was aware that several items had been processed for fingerprints and that no fingerprints had been found when he testified before the grand jury.
Bernardo’s advising the grand jury that the transporting officer was one of two people other than Faris was a good-faith mistake. That incorrect testimony was not given for the purpose of obtaining an indictment and probably did not influence the grand jury’s determination in any way.
The grand jury was not told that Coleman was with Dias in the back seat of the cruiser. The grand jury was not told that the cocaine was found on the rear floor of the cruiser. At the time that he testified before the grand jury, Bernardo had been assigned to the vice and intelligence unit of the detective bureau for approximately three years. He had taken several seminars related to drug enforcement. During his career as a police officer, he had been involved in approximately two hundred narcotics investigation involving cocaine and another two hundred involving heroin. Based upon his training and experience, I infer that Bernardo knew when he testified before the grand juiy that, without the evidence that Coleman had discarded cocaine during his transport, the evidence that the defendant had been engaged in drug trafficking was extraordinarily weak, if not nonexistent. Bernardo knew that the case against Dias was strong whether or not Dias was the source of the contraband found in the cruiser. Bernardo knew that if the grand jury were to reject the inference that the source of the cocaine found in the rear of the cruiser was Coleman, it was unlikely to indict Coleman. I do not find credible Bernardo’s testimony that he did not tell the grand *451 jury that Dias had been in the back seat of the cruiser with Coleman simply because he was not asked that specific question.
I infer that Bernardo chose not to disclose the presence of Dias in the back of the cruiser and thereby give the grand juiy a basis to doubt whether Coleman was the source of the contraband found in the cruiser. He did so for the purpose of obtaining an indictment against Coleman. Bernardo knew that the information he was providing with respect to the Department’s policy and his further statement that, if something is found after transport, “that person owns it” created the misleading impression that the sole possible source of the contraband found in the back of the cruiser was Coleman. Bernardo realized that his testimony resulted in the presentation of distorted evidence.
The presentation of the distorted evidence probably influenced the grand juiy’s determination to indict Coleman. The integrity of the grand juiy proceedings was impaired.
DISCUSSION
Sufficiency of the Evidence
For an indictment to stand, the Commonwealth must present sufficient evidence to the grand juiy to establish the identity of the accused and probable cause to arrest him. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). Probable cause exists where the facts and circumstances presented would warrant the belief, in a person of reasonable caution, that an offense had been committed. “Probable cause requires more than mere suspicion but something less than evidence sufficient to warrant a conviction.” Commonwealth v. Hason, 387 Mass. 169, 174 (1982).
Coleman’s presence in the apartment in close proximity to drugs and drug distribution paraphernalia, all in plain view, combined with the evidence that he discarded crack cocaine in the back of the police cruiser is sufficient to establish the identity of the defendant as the perpetrator and probable cause to arrest him for the crimes charged. No other evidence was required.
Accordingly, the motion to dismiss based upon insufficiency of the evidence is denied.
Integrity of the Grand Juiy Proceeding
The defendant also argues that the indictments against him should be dismissed because the Commonwealth presented distorted evidence to the grand juiy that seriously tainted the presentation to that body. Commonwealth v. O’Dell, 392 Mass. 445, 447 (1984). To secure a dismissal on that ground, the defendant must demonstrate that false or deceptive evidence was given to the grand juiy proceeding knowingly or with reckless disregard of the truth with the intention of obtaining an indictment and that the presentation of such evidence “probably influenced the grand juiy’s determination to hand up an indictment.” Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986). See also Commonwealth v. Drumgold, 423 Mass. 230, 235 (1996). In order to demonstrate that the false or misleading presentation probably influenced the grand jury, there must be “a showing not only that the evidence was material to the question of probable cause but that, on the entire grand jury record, the false or deceptive testimony probably made a difference.” Mayfield, 398 Mass, at 621-22.
There is no requirement that a prosecutor present all available exculpatoiy evidence to the grand juiy. O’Dell 392 Mass, at 447. However, the Commonwealth cannot withhold certain portions of the evidence which it does present when so doing results in a distortion of the evidence. Commonwealth v. Levesque, 436 Mass. 443, 447 (2000) (where the Commonwealth “has provided evidence that gives a distorted picture of its probative force,” the indictment must be dismissed). The Commonwealth has a duty not to compromise the integrity of the institution as happened in O’Dell where the grand juiy heard the incriminating part of a defendant’s statement but not adjacent exculpatory parts, rendering the submission highly misleading. O’Dell 392 Mass, at 447. “Otherwise stated, it is when the prosecutor possesses information that would gravely undermine evidence supporting probable cause that the prosecutor is duty bound to furnish it to the grand juiy.” Commonwealth v. Biasiucci, 60 Mass.App.Ct. 734, 738 (2004).
The fact that Dias was transported with Coleman to the station and was present in the back seat of the veiy same cruiser and thus a potential source of the contraband found on the floor of the rear of the cruiser was undisclosed exculpatory evidence known to Bernardo when he testified before the grand jury. The absence of the information provided, combined with the statements made by Bernardo concerning transport, resulted in a distortion of the evidence that, in the context of this case, gravely undermines the evidence supporting probable cause.
As in O’Dell, the Commonwealth selectively withheld certain portions of the evidence which it did present. The evidence presented indicated that, apart from the possibility that the drugs were planted by a corrupt officer, Coleman was the only possible source of the contraband said to have been found on the rear seat of the cruiser where Coleman had been sitting. Withheld was the fact that cocaine had been found on the rear floor of the cruiser in front of where Coleman had been sitting in the rear with Dias. Indeed, after describing the Department’s policy designed to insure that there is no contraband in the cruiser prior to a person being transported, Bernardo volunteered that “in this instance” the policy means that if something was found after transport, “that person owns it.” Bernardo’s testimony had the same impact as an intentional affirmative misrepresentation that none of the other persons arrested at the premises could have *452 been the source of the contraband found on the rear floor. The only way to prevent such gross distortion of the evidence would have been to disclose that Dias was also present in the back seat, thereby permitting the grand jurors to infer that the source probably was Coleman but not making that inference a virtual certainty.
The Commonwealth argument that the disclosure of Dias’ presence in the back seat was unlikely to have influenced the grand juiy because the other evidence was overwhelming is not persuasive. Coleman’s presence in close proximity to contraband, drug packaging material and other paraphernalia is overwhelming evidence of knowledge, but far from strong evidence either of constructive possession or of joint venture. Constructive possession requires knowledge as well as the ability and intention to exercise dominion and control. Commonwealth v. Brzezinski, 405 Mass. 401, 409 (1989). Joint venture does not require proof of constructive possession but does require the Commonwealth to present evidence that the defendant intended that the contraband be distributed and that he was willing and able to provide assistance to the principal in committing the crime. Commonwealth v. Robinson, 43 Mass.App.Ct. 257, 261-62 (1997). Presence, supplemented by other incriminating evidence, is enough to establish probable cause. For example, presence plus an attempt to conceal or dispose of contraband is sufficient. Commonwealth v. Whitlock, 39 Mass.App.Ct. 514, 519 (1995). Presence without anything else, however, is not enough. Commonwealth v. Boria, 440 Mass. 416, 418-21 (2003) (living in a place where drugs are in plain view and being sold, or associating with someone who controls the contraband is not enough to prove constructive possession); Commonwealth v. Antonio, 45 Mass.App.Ct. 937, 938 (1998) (an inference of unlawful possession or involvement in a joint venture could be drawn from the defendant’s actions at the scene, namely his attempt to prevent the police from entering and his attempt to flee the scene as well as his nervous demeanor as the police approached the hidden drugs, combined with the presence of the defendant’s personal belongings in one of the bedrooms and the close proximity between these personal belongings and the drugs found).
Apart from the evidence of disposal of contraband in the police vehicle, no other factor supports tipping the scale in favor of possession or joint venture. Noticeably absent are any indicia, circumstantial or otherwise, that the defendant had the requisite control or participated in a joint venture. Coleman, for example, did not exhibit any behavior or make any statements amounting to consciousness of guilt. He made no admissions. There is no evidence to support an inference that he lived in the apartment, regularly frequented it or even that he had ever been there before. There is no evidence of his actual participation in any drug sales or his presence during drug sales. No personal papers or effects attributed to Coleman were found in the apartment. Upon his arrest, he was found to be carrying only slightly more than $100. There is no evidence that Coleman was observed looking up and down the street from an apartment window or otherwise acting as a lookout. Cf. Commonwealth v. Hernandez, 439 Mass. 688, 691-93 (2003) (no constructive possession where defendant had no key to premises, was not seen coming or going, had no belongings in the dwelling, and no other evidence linked him to the inside of the dwelling); Commonwealth v. Cruz, 34 Mass.App.Ct. 619, 623 (1993) (insufficient evidence of possession where defendant knew of the presence of contraband in the apartment but neither tried to flee apartment nor tried to protect contraband); Commonwealth v. Brown, 34 Mass.App.Ct. 222, 225-27 (1993) (no constructive possession despite defendant’s presence in an apartment full of drugs because cocaine not found on defendant’s person or in her belongings, the bedroom in which the police found her personal things did not contain drugs, defendant had no key to the premises, none of the furniture was hers, and the duration of her stay was not established).
Faced with only evidence that Coleman must have been aware of the sales preparations regarding the drugs and the presence of drugs not for personal use, the grand jury may not have indicted Coleman. The revelation that the sole source of the contraband in the rear of the vehicle was Coleman virtually guaranteed his indictment. It is likely that the decision to indict Coleman was affected by the omission of the exculpatoiy information.[3]
The omission, at best, was made in knowing disregard of the truth. The officer testifying before the grand juiy knew that his testimony was misleading; he hoped to secure an indictment of Coleman by not disclosing the presence of Dias in the rear of the cruiser and by stating that “in this instance” the Department’s policy concerning checking the cruisers for contraband before the transport meant that if something was found after transport, the person being transported “owns it.” The omission of the fact that Dias was also present in the back seat of the cruiser probably influenced the grand juiy’s decision to issue the indictment. Accordingly, the defendant is entitled to dismissal of the indictments.
ORDER
For the foregoing reasons, the court ORDERS that the defendant’s motion to dismiss based upon insufficiency of the evidence be and hereby is DENIED. It is further ORDERED that the defendant’s motion to dismiss based upon impairment of the integrity of the grand juiy be and hereby is ALLOWED, and the indictments against the defendant, Simeon Coleman are hereby ORDERED DISMISSED.

Coleman actually was transported by Officer Thomas Fans.

In fact, the transporting officer found the cocaine on the floor behind the driver’s seat and had so advised Bernardo.

Nhe fact that the same grand jury indicted the co-defendants does not, as the Commonwealth argues, support the proposition that Coleman would have been indicted even if the grand jury knew that Dias was transported with Coleman to the station. With respect to each of the co-defendants, there is some evidence in addition to presence that would support an inference that such person himself or herself possessed contraband with intent to distribute or was engaged in a joint venture to do so.