COMMONWEALTH vs. SHAWN HUNT
(and three companion cases[1]).

No. 12-P-544.

Bristol. April 10, 2013. - December 20, 2013.

Present: RUBIN, FECTEAU, & HINES, JJ.

*Homicide. Grand Jury. Practice, Criminal,* Grand jury proceedings, Conduct
of prosecutor, Disclosure of evidence, Indictment, Dismissal, Capital case.
*Evidence,* Grand jury proceedings, Testimony before grand jury, Identifica-
tion, Exculpatory, Disclosure of evidence, Credibility of witness, Prior
inconsistent statement, Indictment. *Identification.*

A Superior Court judge erred in allowing, without prejudice, the criminal
defendants' motion to dismiss the indictments where, although the judge
was warranted in concluding, based on the totality of the circumstances,
that the prosecutor acted without reasonable grounds for believing the
material, false statement of a grand jury witness to be true and that, as a
result, he acted with reckless disregard of the truth in his presentation of
evidence to the grand jury [650-656], the evidence was otherwise sufficient
to sustain the indictments [656-659].

INDICTMENTS found and returned in the Superior Court Depart-
ment on January 23, 2009.

Motions to dismiss the indictments were heard by *Gary A.
Nickerson*, J.

*William M. McCauley*, Assistant District Attorney (*Tara L.
Blackman*, Assistant District Attorney, with him) for the
Commonwealth.

*Joseph F. Krowski* for Jonathan Michael Pittman.

*Robert S. Sinsheimer* for Shawn Hunt.

HINES, J. The defendants, Shawn Hunt and Jonathan Michael
Pittman, were indicted for murder in the first degree and carry-
ing a firearm without a license by a Bristol County grand jury.
After a grand jury witness, the victim's mother, admitted to

---

[1]One against Shawn Hunt and two against Jonathan Michael Pittman.

fabricating her identification of the defendants as the perpetrators of the crime, a judge allowed the defendants' motions to dismiss the indictments without prejudice. The Commonwealth now appeals from the order allowing the motions to dismiss, claiming that the judge erred in ruling that the presentation of the witness's false identification impaired the integrity of the grand jury proceedings. Although we conclude that the judge committed no error in his assessment of the Commonwealth's conduct in presenting the evidence to the grand jury, we reverse because the evidence was otherwise sufficient to sustain the indictments.

1. *Background.* On November 20, 2003, Alberto "Tito" Gonzalez was killed by shots fired from a passing motor vehicle in New Bedford. In the immediate aftermath of the crime, the police investigation identified the defendants as possible suspects. The Bristol County district attorney, however, declined to present the case against these defendants (hereinafter, the Gonzalez case) to a grand jury. Almost five years later, a newly elected district attorney presented the Gonzalez case to three successive grand juries,[2] culminating on January 23, 2009, in indictments of the defendants for murder in the first degree and carrying a firearm without a license.

On the eve of trial, the Commonwealth learned that Fernanda Gonzalez, the victim's mother, had fabricated her grand jury testimony identifying Pittman as the person who shot her son and Hunt as an accomplice. In accordance with established law,[3] the Commonwealth promptly disclosed the witness's false statements to the court and the defendants. In response, the defendants filed motions to dismiss the indictments with prejudice, claiming that prosecutorial misconduct in the presentation of the false identification testimony impaired the integrity of the grand jury proceedings.

After a lengthy evidentiary hearing on the motions to dismiss, the judge allowed the motions without prejudice on the grounds

---

[2] The Commonwealth declined to avail itself of the procedure outlined in G. L. c. 277, § 1A, inserted by St. 1952, c. 494, which permits a district attorney to seek court approval to extend the term of a grand jury to "complete an investigation then in progress."

[3] See *Commonwealth* v. *Salman*, 387 Mass. 160, 167 (1982).

that the Commonwealth "proceeded with reckless disregard for the truth of the identification evidence" and that the false identification testimony "probably influenced the decision to indict."

Our analysis of the issues raised by the Commonwealth's appeal is informed by the evidence presented to the grand jury and to the judge at the hearing on the motions to dismiss. The following is a summary of the evidence presented at both proceedings.

a. *The grand jury testimony.* On November 20, 2003, at approximately 6:00 P.M., the victim, Alberto "Tito" Gonzalez (Tito), was shot from a passing motor vehicle at the corner of Hillman and Spruce Streets in New Bedford. Fernanda Gonzalez (Fernanda), Tito's mother, was unloading groceries in front of her home on Spruce Street when the shooting occurred. Tito had just left their home to visit a neighbor who also lived on Spruce Street. As Tito walked in a northerly direction across Hillman Street, Fernanda observed a dark-colored vehicle turn right from Spruce Street onto Hillman Street. As the vehicle made the turn, she heard shots and observed that someone in the vehicle was firing at Tito. Tito bent over at the waist, stumbled a bit, and ran up Hillman Street. As he did so, he yelled at her to go into the house. She watched until Tito disappeared from sight as the vehicle pursued him up Hillman Street.

The police arrived on the scene within minutes after the shooting. They searched the area for Tito but were unable to locate him or find any evidence that a shooting had occurred. After the police left, Tito's family and friends organized a search of the neighborhood. At or around 8:00 P.M., almost two hours after the shooting, one of Tito's friends found Tito's body in the backyard of a residence on Hillman Street. He had suffered a fatal gunshot wound.

Later that night, a team of police officers from the New Bedford police department and the State police returned to the area to begin their investigation into the shooting. Their first lead came from an area resident who told them he had heard shots and had looked toward Hillman Street, where he saw a dark blue or green Ford Focus automobile racing up the street. This person also told the police that the driver was a black male

wearing a black "doo rag." He was unable to see the driver's face or whether other individuals were in the vehicle.

In their interviews with Tito's family and friends that night, the police elicited information suggesting a motive for the shooting and the possible identity of the perpetrators. The police were told that on October 19, 2003, a month prior to the shooting, Tito and some of his friends had been involved in a brawl at a local restaurant. The combatants were two groups of individuals, one group associated with Tito and the other with the defendants. During the fracas, Hunt suffered a serious head injury and was said to be angry and bent on taking revenge. Pittman, also present that night, was angry because of the injury to Hunt, his associate.

Prior to the fight, Pittman and Tito had been friendly; after the fight, their relationship became hostile. Pittman was also upset with Tito because he heard that Tito was bragging that his group had gotten the better of Pittman's group. Tito stopped associating with Pittman, and he told his friends he was afraid of Pittman and his group.

The hostilities continued into the weeks leading up to the shooting. Two days after the fight, Pittman, Hunt, and some of their friends went to a house frequented by Tito and his friends. The owner of the house, the sister of one of the combatants on Tito's side, refused to open the door and threatened to call the police. Pittman and his group left. Tito became aware of Pittman's presence and ran out of the back door to avoid a confrontation.

After the fight, but before the shooting, Hunt went by Tito's house. He accosted Tito's downstairs neighbor, mistaking him for Tito. Hunt told the neighbor that he should tell Tito that he (Hunt) was coming back to get him. Because of this and other threats, one of Tito's friends gave Tito a gun for protection.

Members of the Gonzalez family and other individuals implicated the defendants more directly in testimony about events occurring on November 20, 2003, the day of the shooting. In the early afternoon of that day, Tito and some of his friends were visiting with another friend, who lived just up the street from Tito's residence. At or around 5:00 P.M., Tito received a call on his mobile telephone (mobile phone) from Pittman and

several of his associates. Tito activated the speaker so that his friends could hear the conversation. They heard a voice, identified by Tito as that of Pittman, tell Tito that today was the day he was going to die. Pittman also warned Tito to "bring your heater [gun] home with you tonight because we are going to kill you." Tito was told to come to the Bullard Street area where Pittman and his associates congregated and that if he did not do so, the group would go to his mother's house to get him. The shooting occurred just an hour or so later near Tito's residence.

After the shooting, Pittman called Tito's mobile phone while the family was still at the hospital. There was evidence before the grand jury that Pittman taunted Tito's sister about what had just happened to Tito, asking, "How do you feel now that he's dead? How does it feel that he is dead, that we killed him?"

In the hour after the shooting, Pittman, Hunt, and a third man, known to the police as Rakeem "Ty" Wallace, appeared at the third-floor apartment of Corey Hubbard, one of their associates. They arrived in a dark-colored Ford Focus. The driver parked the vehicle in a concealed location near the apartment. Hubbard's second-floor neighbor heard loud footsteps headed to Hubbard's apartment and decided to go upstairs to see what was happening. Hunt had a gun in his hand. All of the men appeared to be nervous and scared.

During the conversation after the neighbor's arrival, Hunt implicated himself in the shooting, volunteering that he had to "get out of here" because "we" "just took out the kid." There was evidence before the grand jury that Hunt said that they shot Tito "[f]rom the car" and that he (Hunt) had been driving. There was also evidence that Hunt handed the gun and the car keys to Hubbard, ordering him to get rid of the gun and clean out the vehicle. Hubbard then handed the car keys to the second-floor neighbor, who took the vehicle to a car wash and vacuumed up a shell casing he found in the back seat area. There was evidence, based on a police officer's notes from an interview, that later Hubbard wrapped the gun in a sock, tied it to a brick, and threw it into the ocean.

Within a few days of the shooting, the police linked Hunt to the Ford Focus seen leaving the scene of the shooting. They

648      84 Mass. App. Ct. 643 (2013)

Commonwealth *v.* Hunt.

learned that Hunt had rented a blue Ford Focus from a local car dealer, and that the vehicle had not been returned after the shooting. After the police issued a BOLO ("Be On the Lookout") bulletin for the vehicle, a police officer spotted it at a gasoline station in Taunton. Hubbard, in whose apartment the defendants gathered in the immediate aftermath of the shooting, was operating the vehicle. A search of the vehicle revealed a black "doo rag" in the center console and a spent shell casing inside the pocket of the front passenger side door. Investigators also discovered Pittman's fingerprints in the vehicle, as well as an electricity bill in Hunt's name, a receipt from the rental car company in his name, and a piece of mail addressed to him.

The prosecutor presented Fernanda as the only eyewitness to the shooting.[4] She testified that she recognized Pittman as the person in the front passenger seat of the vehicle from which the shots had been fired. She said that she saw Pittman put his head outside the vehicle and fire a gun at her son. She also testified that she recognized Hunt as the passenger in the back seat of the vehicle.

For the purposes of our analysis, we note here, as the judge did in his findings, the factual gaps in the Commonwealth's presentation of Fernanda's identification testimony to the grand jury. The prosecutor presented her testimony without a single direct reference to her statement to police investigators on the night of the shooting that she could not identify the perpetrators.[5] Instead, the Commonwealth provided only the transcript and video recording of Fernanda's interview with New Bedford police Detective Gary Beaudoin, who recorded her statement that she

---

[4]Although three separate grand juries heard testimony in the Gonzalez case, Fernanda testified in person only once, on June 12, 2008. The second and third grand juries received only a transcript of her June 12, 2008, testimony, on July 24, 2008, and December 3, 2008, respectively.

[5]At or around midnight on the night of the shooting, Trooper William Serpa interviewed Fernanda. According to Serpa's police report, Fernanda told him that "she was unable to see how many occupants were in the vehicle and was unable to determine what race or sex they were." She also told him that she did not "recall seeing anybody leaning out of the passenger side of the vehicle." She also did not provide a description to New Bedford police Officer David Amaral, one of the first officers to respond to the scene after the shooting. Neither Serpa nor Amaral was called as a witness before the grand jury.

could now identify the perpetrators.[6] The grand jury were left to review the video recording and transcript of that interview to grasp what they had not been told directly.

Apart from the failure to make any direct reference to Fernanda's earlier statement, the prosecutor also posed a carefully crafted question to Trooper Ann Marie Robertson, the State police investigator assigned to the case:

> *Q.:* "And, Ms. Gonzalez, Tito's mother, she was interviewed, obviously, the night of the shooting and had indicated or had come back for a further interview later on where she identified an individual she believed to be the shooter in the case; is that true?"
>
> *A.:* "That is true."

This question and answer artfully dodged revelation of Fernanda's prior inconsistent statement on the night of the shooting that she could not identify the perpetrators, and created the impression that Fernanda never had wavered in her identification of the defendants.

b. *The motion to dismiss hearing.* We summarize the hearing evidence, keeping in mind that our task is to determine whether the judge erred in ruling that the prosecutor presented Fernanda's identification testimony with reckless disregard for the truth and that this lapse impaired the grand jury proceedings. The police first became aware of Fernanda's new claim that she could identify the perpetrators on February 14, 2004, some three months after the shooting. She appeared at the New Bedford police department, where she spoke to Beaudoin, the lead investigator in the case. Fernanda told him that she now remembered that Pittman was the person who shot her son. She claimed that she saw Pittman lean his body out of the car and fire shots at Tito. She explained her ability to provide this new information by claiming that she realized that Pittman was the person who had shot her son when, in January, 2004, she saw his image on television in connection with his court appearance in another matter. She described to Beaudoin how she had visited

---

[6]Beaudoin, aware of Fernanda's prior statement on the night of the shooting, reminded her that she previously had disavowed knowledge of the identity of the perpetrators.

the court on January 23, 2004, the day when Pittman was scheduled to appear, and that she had said to him, "You killed my boy." When confronted, Pittman denied any involvement in her son's death.

On February 14, 2004, she viewed a six-person photographic array and selected Pittman's photograph. Three days later, on February 17, 2004, Beaudoin interviewed Fernanda again and recorded her statement on video. Beaudoin doubted the veracity of Fernanda's claim that she had seen Pittman shoot her son. Beaudoin communicated his reservations to the assistant district attorney in charge of the case at that time. Although the crime involved an alleged murder with a purported eyewitness, the district attorney declined to open a grand jury investigation.

Prior to the presentment of the Gonzalez case to the grand jury in June, 2008, the district attorney's newly formed "cold case" prosecution team[7] received the entire investigative file on the Gonzalez shooting and had access to the original investigators and their reports. The prosecutor was aware, therefore, of Fernanda's original statement, her motivation to secure the defendants' arrest,[8] the investigators' concerns about the credibility of this new identification, and the prior district attorney's decision not to present the case to the grand jury. Nonetheless, the prosecutor took no steps to vet the plausibility or credibility of Fernanda's proposed grand jury testimony before presenting it to the jury. The witness preparation session on the eve of the hearing on Pittman's motion to suppress Fernanda's identification was the first time she was asked to explain how she saw what she now claimed to have seen on the night of the shooting.

2. *Discussion.* "Although generally the adequacy or competency of evidence before a grand jury is not a matter for judicial inquiry . . . , we will consider whether the evidence before the grand jury was sufficient to support a finding of probable cause

[7]A new district attorney had been elected in 2006. He created or revitalized a "cold case" team to review uncharged major crimes, including the Gonzalez case.

[8]During her interview with Beaudoin, Fernanda explained why she chose to come forward after initially having stated that she had not seen the shooter. She stated: "I have to do something, [nobody else is] doing nothing." The judge found that Fernanda's intent in coming forward was to force the arrest of the defendants to "avenge her son's death."

. . . and whether the defendant has shown that the integrity of the grand jury proceedings was impaired . . . ." *Commonwealth v. Mayfield*, 398 Mass. 615, 619-620 (1986), and cases cited. See *Commonwealth v. O'Dell*, 392 Mass. 445, 446-447, 449-450 (1984). A motion to dismiss on this ground may be allowed only on a showing that (1) false or deceptive evidence was offered knowingly or with "reckless disregard of the truth" of that evidence, *Commonwealth v. Mayfield*, *supra* at 621; (2) the false evidence "probably influenced" the grand jury's decision to indict; and (3) the evidence was presented with the intention of obtaining an indictment (hereinafter, the *Mayfield* factors). *Commonwealth v. Silva*, 455 Mass. 503, 509 (2009), citing *Commonwealth v. Mayfield*, *supra* at 620-622.

In a thoughtful and carefully considered decision, the judge found and ruled that the prosecutor presented false and deceptive evidence to the grand jury, that the prosecutor did so as a consequence of a "reckless disregard for the truth,"[9] and that this lapse impaired the integrity of the grand jury proceedings. In reviewing a decision of a motion judge after hearing on a motion to dismiss brought pursuant to *Commonwealth v. O'Dell*, *supra*, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth v. Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth v. Jimenez*, 438 Mass. 213, 218 (2002). As the Commonwealth claims error only in the judge's findings and rulings on the first two *Mayfield* factors, we limit our discussion accordingly.

a. *Presentation of false or deceptive testimony.* As explained below, the judge's findings and rulings on the first factor — the presentation of false or deceptive evidence with "reckless disregard for the truth" — are unimpeachable. Nonetheless, we describe the Commonwealth's missteps in some detail so as to give guidance on unintentional conduct that may run afoul of this prong of the *Mayfield* test.

---

[9]The judge did not make a finding that the government knowingly presented false evidence but, rather, found that the Commonwealth's "performance amounts to a 'reckless disregard of the truth leading to the presentation of false or deceptive evidence.' " See *Mayfield*, *supra* at 621.

As to this first *Mayfield* factor, the judge cited two reasons for his ruling that the presentation of Fernanda's false and deceptive testimony was the product of a reckless disregard for the truth: (1) the prosecutor was aware of but omitted any direct reference to Fernanda's prior exculpatory statement that she could not identify the perpetrators; and (2) the prosecutor presented Fernanda's identification without qualification, despite compelling reasons to doubt the credibility of her claim. We conclude that there was no error in the judge's findings and rulings on this factor. The falsity of Fernanda's testimony is not open to question given the Commonwealth's admission of this fact in its disclosure to the defendants and the court.[10] The judge could hardly find otherwise. Nor was there error in the judge's finding that the particular presentation of Fernanda's identification testimony, without the qualification of her earlier inconsistent statement, was deceptive. The judge properly could find, as he did, that the omission of a direct reference to the earlier statement created a false impression of Fernanda's value as an eyewitness.

We are satisfied that the judge correctly ruled that the Commonwealth's decision to avoid any direct reference to Fernanda's prior inconsistent statement that she could not identify the shooter evinced a reckless disregard for the truth.[11] Our cases have not defined precisely the parameters of conduct that evinces a "reckless disregard of the truth" in the context of grand jury proceedings. We think it appropriate, however, to rely here on interpretations of the concept in analogous settings, as in cases invoking the principles of *Franks* v. *Delaware*, 438 U.S. 154,

---

[10]The Commonwealth challenges the judge's finding that "Fernanda was unable to describe in any respect her son's assailants on the night of the crime," a critical fact underlying his conclusion that the prosecutor acted with reckless disregard for the truth in presenting her testimony to the grand jury. The Commonwealth claims that Fernanda allegedly told the police that she saw two black males in the vehicle that night. Even if she made that statement, it would not in any way undercut the judge's finding; the reference to "two black males" does not qualify in any respect as a description.

[11]The judge's characterization of the Commonwealth's conduct in the presentation of Fernanda's identification testimony is charitable. The prosecutor's purposeful and skillful maneuvering to avoid any direct reference to Fernanda's unequivocal initial statement that she was unable to see or identify the perpetrators is highly suggestive of distrust in the credibility of her later statement.

155-156 (1978), to challenge the credibility of statements made in support of an application for a search warrant. The operative fact in the *Franks* line of cases, as here, is the government's reliance on false or deceptive information, either intentionally or with "reckless disregard for the truth," to justify the exercise of prosecutorial authority in a criminal proceeding. In *Commonwealth* v. *Nine Hundred & Ninety-Two Dollars*, 383 Mass. 764, 769 (1981), for example, the Supreme Judicial Court suggested that the ultimate determination of recklessness might be based on whether the affiant acted "without reasonable grounds for believing the . . . false statement" to be true. See, e.g., *Commonwealth* v. *Ramos*, 72 Mass. App. Ct. 773, 776-777, 780-781 (2008) (upholding a motion judge's ruling that a police officer acted with reckless disregard of the truth when he made material misstatements about facts that should have been known to him). We review the judge's rulings in light of this interpretation of "reckless disregard of the truth."

The judge correctly ruled that the Commonwealth's failure to present Fernanda's prior inconsistent exculpatory statement to the grand jury was attributable to its reckless disregard of the truth. Although the Commonwealth is "not required in every instance to reveal all exculpatory evidence to a grand jury," *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985), a prosecutor is obligated to do so when the evidence "would greatly undermine either the credibility of an important witness or [the evidence is] likely to affect the grand jury's decision." *Commonwealth* v. *Clemmey*, 447 Mass. 121, 130 (2006), quoting from *Commonwealth* v. *Wilcox*, 437 Mass. 33, 37 (2002). Fernanda's prior inconsistent statement, in which she unequivocally denied any ability to identify the perpetrators of the crime, was exculpatory in the sense that it "calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Bly*, 448 Mass. 473, 485 (2007), quoting from *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). Indeed, there is little question that the prosecutor would have been obligated to disclose it to the defendant as exculpatory. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-405 (1992), citing *Brady* v. *Maryland*, 373 U.S. 83, 87

(1963). Thus, the judge committed no error in attributing this lapse to a reckless disregard of the truth.

The deception inherent in the Commonwealth's failure to make a full disclosure of Fernanda's exculpatory statement was exacerbated by the prosecutor's careful scripting of Trooper Robertson's testimony to create the impression that Fernanda's identification was consistent and reliable.[12] The presentation of the evidence in this fashion skirted the Commonwealth's obligation under *Commonwealth* v. *Clemmey*, 447 Mass. at 130, to reveal exculpatory evidence that would "greatly undermine . . . the credibility of an important witness." We do not presume to dictate the form or manner in which evidence is presented to a grand jury. Nonetheless, we discern no error in the judge's ruling that the Commonwealth's failure to abide by its obligation to fairly present the evidence, including exculpatory evidence, was the product of a reckless disregard for the truth of the information provided to the grand jury.

The Commonwealth argues that the presentation of Fernanda's prior inconsistent statement in the video recording and the transcript of Beaudoin's interview of her on February 17, 2004, satisfied any obligation to present that evidence to the grand jury. We disagree. The grand jury would not necessarily understand from the video recording or the transcript that Fernanda's identification testimony was a stark reversal of her initial statements. Neither contains the contemporaneous police reports, the only documents that fully explicate the limits of Fernanda's ability to assist the police in their investigation on the night of the shooting. Also, Beaudoin's questioning of Fernanda about the change in her testimony did not disclose what she said to the officers on the night of the shooting, that is, it did not fully disclose the depth and breadth of her prior inconsistent statement.[13] The Commonwealth, consistent with its duty to respect the integrity of the

---

[12]We note in particular the judge's finding that "[t]he prosecutor's carefully crafted question . . . glided over Fernanda's inability to make an identification on the night of the shooting in favor of her later identification."

[13]The questioning did not reveal that she had said to Trooper Serpa in an interview on the night of the shooting "that she was unable to see how many occupants were in the vehicle and was unable to determine what race or sex they were." See note 5, *supra*.

grand jury process, cannot hide the ball and expect the grand jury to find it.

The judge also ruled that the prosecutor's decision to present Fernanda's testimony to the grand jury despite sufficient reasons to doubt her credibility even before her deception came to light arose from a reckless disregard for the truth. There was no error. Fernanda's statement to Serpa on the night of the shooting unequivocally denied any ability to identify the perpetrators. Nothing in this statement suggested uncertainty or doubt that might be subject to clarification at some later date. Thus, any later statement so starkly different in the witness's perception of the events would be highly suspicious for recent contrivance.

The timing of the new identification also strongly suggested recent contrivance. Based on the evidence presented at the hearing, the judge found that when Fernanda visited Beaudoin at the New Bedford police department on February 14, 2004, her mission was intensely personal. Her newly conceived identification was brought forward with the goal of avenging her son's death.[14] In the months leading up to Fernanda's visit with Beaudoin, the Gonzalez family and Tito's friends were all convinced that Pittman and Hunt were involved in Tito's shooting. They were aware also that the police, although suspecting the defendants, had declined up to that point to make arrests. On these facts, the judge properly could conclude that the prosecutor's decision to ignore Fernanda's apparent motive to force the police to act against the defendants, coupled with the complete reversal in her ability to make an identification, exhibited a reckless disregard of the truth.

Also, as the judge found, the prosecutor overlooked an obvious inconsistency in Fernanda's identification testimony. It would have been physically impossible for her to see the shooting from her vantage point on Spruce Street just south of the intersection when, according to her statement, the shooting occurred after the vehicle turned the corner in a westerly direction onto Hillman Street. With a minimum of attention to detail, the

---

[14]During her interview with Detective Beaudoin on February 17, 2004, Fernanda explained why she chose to come forward after initially stating that she did not see the shooter. She stated: "I have to do something, [nobody else is] doing nothing."

prosecutor would have discovered this inconsistency sooner rather than later.[15]

The prosecutor and his team were aware of the entire sequence of events leading to Fernanda's claim that she could now identify the individuals in the vehicle that night. The judge expressly discredited Trooper Robertson's testimony that she had no reason to doubt the validity of Fernanda's identification.[16] The totality of circumstances surrounding Fernanda's newly claimed ability to identify the perpetrators, together with the Commonwealth's failure sufficiently to vet either the reliability or credibility of her statements, were sufficient to warrant the judge in ruling that the prosecutor acted without "reasonable grounds for believing the material, false statement" to be true and that, as a result, he acted with reckless disregard of the truth in his presentation to the grand jury. See *Commonwealth* v. *Nine Hundred & Ninety-Two Dollars*, 383 Mass. at 769.

With respect to the doubts concerning Fernanda's credibility, the Commonwealth argues that it cannot be compelled to accept the prior district attorney's and Beaudoin's skepticism of Fernanda's credibility because to do so would limit the prosecutor's exercise of his prerogative in presenting a case to the grand jury. We do not confuse a prosecutor's prerogative to make independent judgments in deciding which cases or which evidence will be presented to a grand jury with his or her duty to make fair and prudent judgments in exercising that prerogative. The failure to take any account of the facts undermining the reliability of Fernanda's identification was both unfair and imprudent and properly could be considered in assessing recklessness.

b. *Likely impact of the false testimony.* The second prong of the *Mayfield* test requires that we examine whether the judge properly concluded that the false identification "probably influenced" the grand jury in its decision to return indictments against the defendants. See *Commonwealth* v. *Mayfield*, 398 Mass. at 621-622. Here, the judge ruled that "[i]t is well-nigh

---

[15]The grand jurors were never given the information that would have allowed them to reach this conclusion.

[16]We note in this regard the judge's finding that Trooper Robertson's denial of knowledge of Fernanda's initial statements "strains credibility."

impossible for this court to safely say that the grand jurors would have indicted in the absence of the false identification testimony." He reasoned that Fernanda's testimony obviously was important to the grand jury because she was the only eyewitness to the crime. He noted that "the dangers present whenever eyewitness evidence is introduced against an accused require the utmost protection against mistaken identifications." See *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995). The judge was correct to express concern about and be wary of "the pernicious effect of a false identification" in establishing the requisite probable cause. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 796-797 & n.20 (2009). As to the weight to be accorded to other evidence presented to the grand jury, the judge acknowledged that such evidence existed but concluded that given "the totality of the circumstances, the defendants have met their burden of showing that the false identification testimony probably influenced the decision to indict."

The question on a motion to dismiss is not simply whether the false or deceptive testimony "probably influenced" the grand jury in some abstract sense. Rather, the defendant must show not only that the evidence was material to the question of probable cause but also that on the entire grand jury record, the false or deceptive testimony probably "would have affected the decision to indict." *Commonwealth* v. *Silva*, 455 Mass. at 508, citing *Commonwealth* v. *Mayfield*, 398 Mass. at 621-622. See *Commonwealth* v. *Freeman*, 407 Mass. 279, 283 (1990) (whether the statements "viewed in the context of all the evidence presented to the grand jury, 'probably made a difference' in their decision to indict him"). Thus, we are constrained to look beyond the Commonwealth's recklessness and focus our analysis on the question whether, "if the grand jury had been told the true facts, it probably would not have indicted the defendant[s]." *Commonwealth* v. *Mayfield*, *supra* at 621, citing *Commonwealth* v. *McGahee*, 393 Mass. at 746-748.

Viewing the entire grand jury record under this standard, we conclude that it is unlikely that the disclosure of the withheld information would have affected the grand jury's decision to indict the defendants. *Commonwealth* v. *McGahee*, *supra* at

747. The revelation that Fernanda first disclaimed any ability to identify the perpetrators would not likely have undermined the value of other evidence tending to show that the defendants committed the crime. The defendants' admissions and post-shooting conduct were highly probative of their guilt independent of Fernanda's false claims.

As to Hunt, evidence was presented to the grand jury that he admitted to the shooting in the presence of others immediately following the crime. His statement that he had to "get out of here" because "we" "just took out the kid" is highly inculpatory. That admission is even more damaging in the context of the evidence of Hunt's appearance at Hubbard's apartment just after the shooting in possession of a handgun and that Hunt surrendered the weapon to Hubbard with instructions to get rid of it. The evidence that Hunt had been injured in the melee with Tito's group suggested a motive for the crime. Also, Hunt was linked to the vehicle used in the shooting by evidence that he rented the vehicle from a local car dealer and evidence that he gave a post-shooting directive to "clean" the car. The police searched this vehicle and found incriminating evidence, including a black "doo rag," said by a witness to the shooting to have been worn by the driver on the night of the shooting, and a spent shell casing, as well as other evidence linking Hunt to the vehicle.

Similarly, Pittman implicated himself in statements and actions before and after the shooting. The evidence tended to show that in the weeks following the fight in which Hunt was injured, Pittman engaged in a campaign of threats against Tito. There was evidence that, on the day of the shooting, Pittman told Tito that this was the day he was going to die. There was also evidence that after the shooting, and while the family was still at the hospital, Pittman called Tito's sister, taunting her with the question, "How do you feel now that he is dead? How does it feel that he's dead, that we killed him?" There was also evidence that in the immediate aftermath of the shooting, Pittman appeared with Hunt, who, according to the evidence presented to the grand jury, was the self-confessed shooter and connected to the rental car involved in the shooting, at Hubbard's apartment, where they made plans to get out of town.

Further, investigators found Pittman's fingerprints in the vehicle used in the shooting. Pittman also gave false statements to the police about his connection to Hunt, his contact with Tito on the day of the shooting, and whether he had ever been in the vehicle used in the shooting.

To be sure, Fernanda's false eyewitness testimony was important to the Commonwealth's case against the defendants. We are persuaded, however, that the defendants' statements and conduct, both before and after the crime, and the physical evidence linking them to the vehicle apparently used in the shooting are sufficiently inculpatory to relieve the Commonwealth of the adverse consequences that might otherwise flow from its conduct of the grand jury proceedings and that the evidence submitted to the grand jury, apart from Fernanda's identification testimony, was sufficient "to establish the identity of the accused . . . and probable cause to arrest [them]." *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). See *Commonwealth* v. *O'Dell*, 392 Mass. at 450-451.

> *Order allowing motions to dismiss indictments reversed.*